DeCARLO, Judge.
Second degree murder; fifty years.
On July 18, 1979, Earl Lee McClendon was found dead with approximately fourteen bullet wounds on his body and a machete by his side. Appellant was tried twice for the murder of McClendon. His first trial resulted in a conviction of first degree murder and a sentence of life imprisonment. He then moved for a new trial and, after a hearing on the motion, he moved to dismiss the indictment. The trial court denied his motion to dismiss the indictment, but granted his motion for a new trial, set aside his conviction, and ordered a new trial date.
Prior to his second trial, appellant filed a plea of former jeopardy, contending that prosecutorial misconduct before and during the first trial, of which he was previously unaware, barred his re-trial. He alleged that the district attorney’s office had withheld material exculpatory evidence from him and had knowingly used perjured testimony at the first trial. Appellant’s allegations of prosecutorial misconduct center on the testimony of State’s witness Jerry Fails.
At the first trial, Fails testified that he witnessed the killing of Earl Lee McClen-don. He stated that he was in the car with *1330 appellant when McClendon approached the car without a weapon and in a non-threatening manner. Fails said that appellant reached for his .357 revolver and shot McClendon “for no reason.” McClendon fell and appellant then stepped halfway out of the car, reached in his shirt pocket for his .25 caliber automatic pistol, and shot McClendon again.
According to Fails, appellant then threw something out of the car and drove away. Fails said that appellant told him the object he threw out of the car was a “sword or machete.”
On cross-examination, Fails admitted a prior burglary conviction and the fact that he was then in jail awaiting disposition of two other felony charges. Fails denied talking to Deputy District Attorney John Black or homicide detective Sgt. Albert Wallace about the case. He also denied that anyone from the district attorney’s office had made a deal to dismiss his pending felony charges in return for his testimony.
Two weeks after appellant’s first trial, the pending felony cases against Jerry Fails were dismissed. Appellant’s allegations of prosecutorial misconduct stem from the following testimony of Deputy District Attorney John Black at the hearing on appellant’s motion for new trial:
“Q. [By appellant’s counsel] [D]id you inform me by telephone that certain information had come to light as to the way Jerry Fails had testified in the case in the presence of the jury was inconsistent with what you had learned from him when you interviewed with him?
“A. Yes, sir.”

“[By Mr. Black] At some time prior to the trial of Robinson, ... Albert Wallace brought Jerry Fails to my office in the District Attorney’s office for the purposes of talking with him concerning what he knew about the murder case against Robinson.
“At that time Fails told me and Sergeant Wallace that he had been in the car with Robinson when the man was killed... Fails said that Robinson pulled into the parking lot and stopped his car and was looking through his rear view mirror toward the building. That the deceased or the person soon to be deceased came walking up toward the car; that he had a — I think the term he used was a machete in his hand, which still had a sheath on it. And that as he walked up to the car he was waving the machete. And he added that he was — that the man with the machete was joking or kidding or that he did not intend harm. I think the words he used were that he was kidding. And that as he walked up to the door of the car that Robinson was sitting in the driver’s seat, and that as he walked up to the driver’s side of the car that Robinson turned and shot him several times.

“At that point I told Sergeant Wallace— All right. In response to a later conversation with Sergeant Wallace I told him that what the witness Fails, said could be construed in my opinion as self defense. That at that point I thought it was possible that we were under a duty to divulge that information to yourself, Mr. Jones. “At that point I had a conversation with Attorney George Jones for the defendant, in which — Number one, we had in our file a statement by the defendant in which he said that he was not the man who had shot this person, that he was not there and nowhere in the area. After talking to Mr. George Jones, George Jones told me that he was aware that there was a machete laying on the ground at the scene of the killing, and that he could not use self defense because his client, Mr. Robinson, contended that he was not the person who had been there and that shot this man—
“At that point I did not divulge what Mr. Fails had said. Now, Mr. — Of course, and this was prior to trial. I had several phone conversations from Fails and I never did talk to him. He would call and leave a message, and I never would talk to him. I had a conversation with Sergeant Wallace later, and then I had another conversation with Fails on the tele *1331 phone. And he told me this or this in substance, Sergeant Wallace has told me that saying that about the machete would hurt the case, something to that effect. And then he then said now I didn’t see that machete, that was something that Robinson told me later....
“Q. [By Defense Counsel] Now, the information that you have testified to, did Sergeant Wallace know that?
“A. Yes, sir.
“Q. Did y’all discuss it?
“A. After — Before I talked to Fails the second time, which was by telephone, Sergeant Wallace called me and said that Fails was now saying that the part about the machete in the deceased’s hand was something that Robinson had told him. “And at that point I told Sergeant Wallace that I thought at that point that he was going to lie, and that we would not use him as a witness.
“Q. Well, let me ask you this, Did— “THE COURT: Wasn’t Fails a State witness?
“MR. JONES: Yes, sir.
“Q. Now, Mr. Black—
“THE COURT: I thought I remembered that—
“Q. Mr. Black, let me ask you this: You were the assigned trial district attorney, and I’ll ask you the week prior to the trial did your additional and other duties require this case to be assigned or the details to be tried by somebody else and did you, in fact, not assign this case to be tried by somebody as a division chief?
“A. Yes, sir.
“Q. And who did you assign it to?
“A. Ken Gomany.
“Q. Did you in substance inform Mr. Gomany or Mr. Davis, who tried this case, of any of the matters that you’ve testified to here today concerning Mr. Fails’ testimony or what it could or could not be expected to be?
“A. Yes, sir.”
Appellant’s plea of former jeopardy was overruled and he was tried again. During the second trial, Fails was called as the court’s own witness. His version of McClendon’s shooting coincided with his testimony at the first trial. On cross-examination, however, he admitted that he had given the district attorney a prior inconsistent statement regarding the circumstances of the shooting. He also admitted that his felony charges had been dismissed after appellant’s first trial. Appellant’s second trial resulted in a conviction of second degree murder and a sentence of fifty years.
I
Appellant cites United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), and United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970), in support of his contention that reproseeution should have been precluded by the Fifth Amendment protection against double jeopardy. He contends that the State’s failure to turn over self-defense material prior to trial and its “knowing use of perjured testimony” at trial constituted prosecutorial bad faith which should have barred his retrial.
In Dinitz and Jorn, the United States Supreme Court alluded to the general rule that a defendant who moves for a mistrial cannot claim double jeopardy when his motion is granted and he obtains a new trial. By his motion for mistrial, he is deemed to have consented to end the first trial and obtain another one.
The court indicated, however, that if a defendant is forced to move for a mistrial because of “prosecutorial overreaching,” Dinitz, supra at 608, 96 S.Ct. at 1079, or “bad faith conduct by judge or prosecutor,” Jorn, supra at 485, 91 S.Ct. at 557, then he is not deemed to have elected to terminate his first trial and to obtain a new one. Instead, his motion is treated as a motion for mistrial by the prosecution and a retrial would constitute double jeopardy. Neither Dinitz nor Jorn, however, is applicable here since we are confronted not with a motion for mistrial, but with a motion for new trial. We therefore find the analysis of the mistrial cases of little value in determining whether double jeopardy bars reproseeution after a successful motion for a new trial. *1332 In our judgment, the reasoning of the cases finding no jeopardy problem with a new trial after reversal of a conviction is more apt here.
Ordinarily, when one who has been convicted successfully seeks review of that conviction there is no double jeopardy impediment to a new trial. United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947); United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896).
Although appellant’s motion for new trial was addressed to the trial judge and was not, in contrast to Tateo, Resweber, and Ball, supra, a submission for appellate review, it was nevertheless a request for judicial scrutiny of his conviction. The granting of a motion for new trial by the trial court is analogous to the reversal of a conviction by an appellate court; both result from error at trial. See Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). When the cause for reversal is error at trial, as opposed to eviden-tiary insufficiency, there is no double jeopardy upon a retrial. Burks, supra.
In Burks, supra at 15, 98 S.Ct. at 2149, the United States Supreme Court observed the following:
“[Rjeversal for trial error, as distinguished from evidentiary insufficiency, ... is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e. g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.”
Appellant urges us to accept the rationale of the mistrial cases, maintaining that he would have moved for (and been granted) a mistrial had he known of the alleged prose-cutorial misconduct during the first trial. This argument was considered and rejected in United States v. Barham, 608 F.2d 602 (5th Cir. 1979).
In Barham, supra, the Fifth Circuit Court of Appeals held that the government’s knowing use of perjured testimony at the defendant’s first trial did not bar a retrial after reversal of his conviction. The court determined that
“[T]he prosecutor’s conduct did not amount to prosecutorial overreaching or bad faith and that in any event double jeopardy bars a retrial after conviction only when the conviction is reversed for insufficiency of the evidence.” United States v. Barham, 625 F.2d 1221 (5th Cir. 1980).
Following the reasoning of Burks, supra, and Barham, supra, we hold that there was no double jeopardy impediment to appellant’s retrial on the basis of the prosecution’s alleged knowing use of perjured testimony at the first trial. Appellant received the relief to which he was entitled for error at his first trial — a new trial.
We also hold that there was no double jeopardy barrier to appellant’s reprose-cution based on the State’s failure to disclose alleged self-defense material prior to trial.
It is well-settled that the prosecution is under a duty to disclose material exculpatory evidence to the defense. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In the instant case it is clear that Fails’ first statement (that the victim approached the appellant with a machete) was both material and exculpatory. “If evidence highly probative of innocence is in [the prosecutor’s] file, he should be presumed to recognize its significance, even if he has actually overlooked it.” United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).
Therefore, we do not condone the decision by the district attorney to withhold possible self-defense material on the basis of his belief that an alibi defense would be asserted. It is not the function of the State to weigh the tactical merits of a particular *1333 defense. See Jones v. State, Ala.Cr.App., 396 So.2d 140 (1981). “[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure.” Agurs, supra, at 108, 96 S.Ct. at 2399-2400.
Although we believe that disclosure of Fails’ statement should have been made, we do not find that the failure to do so barred appellant’s retrial on the basis of the double jeopardy clause. The prosecution’s failure to disclose exculpatory evidence entitles the accused to a new trial, Agurs, supra; Brady v. Maryland, supra, and here appellant obtained the relief to which he was entitled.
II
Appellant contends that the “one for one” strike method of selecting jurors in Jefferson County is a violation of due process and a denial of equal protection because it is accomplished pursuant to a statute which affects only Jefferson County. Challenges to the “one for one” strike system, however, have been consistently rejected and the procedure upheld, by a long line of Alabama cases. See Tucker v. State, Ala.Cr.App., 383 So.2d 579, cert. den., Ala., 383 So.2d 586 (1980), and cases cited therein.
III
Appellant claims that he was improperly precluded from showing the victim was under the influence of drugs at the time of the killing.
From the record:
. “Q. [By Defense Counsel] Is part of your investigation to these requests that the blood alcohol level be done on the decedent plus the urine sample?
“A. [By Coroner Dale Cunningham] Yes, sir, that is true.
“Q. What was the blood alcohol level of the blood sample?
“A. The blood sample was .18 percent ethyl alcohol.
“Q. And how about the urine sample?
“A. It was .24 percent.
“Q. And did you check for other lacerations and scars or anything on the body other than the wounds you talked about?
“MR. GOMANY: [Assistant District Attorney] Objection unless we go into—
“THE COURT: I don’t know what you are talking about.
“MR. JONES: [Defense Counsel] I am talking about three—
“THE COURT: Sustain the objection.
“Q. Did you examine — you testified on direct examination you made a close examination of the decedent’s body after he had been disrobed and cleaned, is that correct?
“A. I was present while this was done, yes, sir.
“Q. Did you notice the arms of the decedent along here? (indicating).
“THE COURT: I sustain the objection, Mr. Jones.
“MR. JONES: Judge, may we make a proffer outside of the presence of the jury?
“THE COURT: At the proper time, I will let you do that, yes, sir.”
Outside the presence of the jury, appellant made the following offer of proof:
“THE COURT: I’m not precluding you from showing reputation.
“MR. GOMANY: Judge, it is my understanding—
“THE COURT: And you wanted to show that he had needle marks on his arms which I am not going to let you show. Was that the other thing you wanted to proffer?
“MR. JONES: The protocol shows that a crystalline in the substance in the lungs that was—
“THE COURT: That shows past drug abuse, I’m not going to let you show that.
“MR. JONES: Well, Judge, I think it would go on a bearing as to whether or not what kind of condition this man was in that night.
“THE COURT: Overruled.”
Appellant argues that evidence of the victim’s drug use, in connection with other evidence that “when drinking or getting high, [the victim] would be violent” was relevant to the issue of self-defense. We accept appellant’s argument as a gener *1334 al proposition, see Long v. State, 23 Ala.App. 107, 121 So. 453 (1929), but we do not believe it is applicable here. For all that appears from appellant’s offer of proof, the needle marks on the victim’s arms and the crystalline substance in the victim’s lungs indicated only past drug abuse, as the trial court pointed out, and did not demonstrate that the victim had been using drugs immediately prior to his death. See Stewart v. State, 29 Ala. 594, 165 So. 840 (1936). Appellant did not seek to introduce any other testimony which would have pointed to recent drug use by the decedent.
It is our judgment, therefore, that the trial court acted to exclude evidence which appeared to be remote. The exclusion of remote evidence is within the discretion of the trial judge, Hembree v. City of Birmingham, Ala.Cr.App., 381 So.2d 664 (1980), and his decision will not be overturned on appeal in the absence of gross abuse. Gamble, McElroy’s Alabama Evidence, § 21.01(2) (3d ed. 1977).
IV
Appellant complains of error in the • trial court’s refusal of eleven written requested jury charges. The court’s oral charge, however, substantially and fairly covered the same rules of law contained in appellant’s requested instructions. The refusal of a charge, even though it is a correct statement of the law, is not error if the same principle is substantially and fairly covered in the court’s oral charge. Ala. Code § 12-16-13 (1975); Turner v. State, Ala.Cr.App., 380 So.2d 393 (1980); Mains v. State, Ala.Cr.App., 375 So.2d 1299 (1979).
We have searched the record for error prejudicial to appellant and have found none; therefore, the judgment of conviction by the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.