Appellant was tried on an indictment charging him in two counts with the murder of Ricky Andrew Vinson by shooting him with a shotgun. A jury found him guilty of manslaughter. The court fixed his punishment at imprisonment for six years and sentenced him accordingly.
The undisputed evidence was to the effect that the alleged victim was killed by buckshot fired from a shotgun by some person on a truck near the victim's home on the night of September 14, 1980, and that appellant was on the truck with four other persons at the time. He denied firing the weapon on the occasion, and there is little, if any, basis for an inference from the evidence to the contrary. The controverted issue between the parties on the trial was chiefly whether he was an accomplice of the one on the truck who did fire the fatal shot. Several witnesses testified as to the circumstances of the incident, including appellant and the four others on the truck with him, one of whom was Mason Gibson, who testified on call of the State and who had been previously convicted of manslaughter of the alleged victim. Mason Gibson admitted that he either invited or permitted the others to go with him on the trip to the vicinity of where the alleged victim lived, and further testified that he was undertaking to find the number of the tag of an automobile from which some people had been firing weapons near him and otherwise molesting him. He further admitted that he fired a shotgun at or about the time the alleged victim was killed and the alleged victim's wife was hit by some shot from a shotgun. Although defendant's testimony in the case perhaps made a better case for him than a written statement he made to officers soon after his arrest as to his asserted innocence of any intention to join in any effort to shoot or kill any human being, his written statement, which was introduced in evidence by the State, contains a more condensed recital of the incident and the foregoing and succeeding circumstances, and for that reason it is here quoted:
 "On Sunday night September 14, 1980, I was at Stanley Lawrence's house in Limestone County. Present at Stanley's house were Stanley Lawrence and his wife, Doug Tucker, Rex Howard, Charles Ray Gibson, Mason Gibson, Joyce Gibson, Cindy Gibson, Den Den Gibson and myself. Shortly after dark the phone rang on several occasions. The caller was supposedly calling Stanley Lawrence, Mason Gibson and his kids white trash. We hung around the house for a while. At about 9:30 or 10:00 P.M. we heard a car from the hill above Stanley Lawrence's house. We talked around for a while and decided to go to the Salem Skating Rink. Mason Gibson, Charles Ray Gibson, Rex Howard, Doug Tucker and I got into Mason Gibson's red Chevrolet pickup and started toward the Salem Skating Rink. Mason Gibson, Rex Howard and I was in the back of the pickup. Doug and Charles Ray was in the front. I think everyone but Charles Ray Gibson had a gun. I'm not sure whether or not Charles Ray had a gun. Charles Ray Gibson was driving the truck. I had a 12 gauge single barrel shotgun, Mason Gibson had a 12 gauge or 410 gauge shotgun, Rex Howard had a 410 gauge shotgun and Doug Tucker had a 410 gauge shotgun. My gun was unloaded. I'm not sure any *Page 1376 
of the others was loaded. We carried the guns because the people from the skating rink had been coming to Mason's house and shooting at them. We had the guns with us for protection. We were afraid the people would shoot at us. We went to the skating rink at about 11:00 P.M. I'm not sure of the exact time. We came in off Highway 99 and started circling the parking lot at Salem Skating Rink. We had almost made it out of the parking lot when Mason Gibson hollered out `If I'm white trash, you are black trash.' As Mason hollered this out there was three shots fired from Ricky Vinson's trailer that was parked in the skating rink lot. Mason Gibson picked up his gun and fired up toward the Vinson trailer in the air. Mason fell down in the back of the truck from the recoil of the gun. When Mason fired back someone came from behind a light pole in front of the trailer and started running toward Leo Michael's house and started shooting at us. There was also some shots fired from across the road. When the man running from the trailer started shooting at us Mason Gibson raised his gun and shot two more times into the air toward the trailer. There was also someone near the electric plant behind the skating rink that was shooting at us. There was also someone behind the light pole in front of us shooting at us.
 "There was just two other shots fired out of the truck. Rex Howard shot once in the air and Doug Tucker shot once in the air. I didn't pick up my gun.
 "There was 6 or 7 people at the skating rink shooting at us. After leaving the skating rink we went to Mason Gibson's house and hid the truck. We got into an old 4 door Chevrolet and went to Stanley Lawrence's house. We took the guns there and left them.
 "When we went into Stanley Lawrence's house Joyce Gibson told us someone had been shot at the skating rink. We didn't know anyone had been killed. Someone said we had better go because the law would be here in a minute. Mason Gibson got a phone call and the caller told him to come over to Lonie Gibson's and they would pick him up and carry him to jail because they had heard the law was looking for him. Doug Tucker and I went out and hid in the weeds at the side of the house.
 "The people at the skating rink were shooting rifles and pistols. I think the rifles were automatic.
 "I have read the above statement and the facts contained are true to the best of my knowledge."
The statement was signed by appellant and witnessed by two officers on September 16, 1980.
Appellant was nineteen years of age at the time of the incident upon which the prosecution herein was commenced. He was questioned on cross-examination by the State as to a "conviction" on August 29, 1980, of third degree theft. He replied that he "couldn't say it was third degree" but that he was convicted of theft. Appellant urges as error that the State should not have been allowed to show such previous conviction, which it did on cross-examination of defendant, for that he was at the age of a youthful offender at the time of his commission of theft in the third degree and that he did not have counsel at the time of his conviction. As to the first ground, it does not appear from the record proper or from the transcript of the proceedings that defendant was tried in the theft case as a youthful offender. In that state of the record proper and the transcript of the proceedings, it cannot be said that the judgment in the theft case was an adjudication as a youthful offender as distinguished from the judgment in a case that was not handled as a youthful offender proceeding and as to which the confidentiality of youthful offender proceedings does not apply. Daniels v. State, Ala.Cr.App., 375 So.2d 523, 526-527
(1979).
Appellant's other ground for challenging the court's action in permitting evidence of *Page 1377 
defendant's previous conviction, viz., that he was not afforded an attorney at the time, is equally not well taken, in view of the fact that his conviction was for a misdemeanor and his punishment consisted of a fine as distinguished from imprisonment. The constitutional right to counsel extends to misdemeanor cases involving the loss of liberty. Argersinger v.Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). However, the constitutional right to counsel does not extend to misdemeanor cases unless the defendant is actually sentenced to jail. Lake v. City of Birmingham, Ala.Cr.App., 390 So.2d 36, 38
(1980), citing Scott v. Illinois, 440 U.S. 367, 99 S.Ct. 1158,56 L.Ed.2d 383 (1979).
Another contention for a reversal is that the court committed error "in not allowing appellant to explain his prior conviction." Appellant argues that he "should have been able to show why he pled guilty" that the "reasoning would fall on the age of the defendant at the time of the first conviction." The only rulings shown by the transcript of the evidence adverse to defendant in any way connected with the defendant's effort to "explain his prior conviction" or to "show why he pled guilty" are found in the first part of the redirect examination of the defendant as follows:
"Q. And what were you charged with stealing?
"A. A watermelon.
"MR. SANDLIN: Judge, we object to the details.
 "THE COURT: Well, I think the details are probably not admissible so I think I would have to sustain it.
 "Q. (By Mr. Hunt) Were you given a jail sentence in that case or fined?
"A. Fined.
"MR. SANDLIN: Judge, we object to the details.
 "THE COURT: There again the objection would be due to be sustained.
 "Q. (By Mr. Hunt) Did you have an attorney on that occasion?
"A. No, sir.
 "MR. SANDLIN: Your Honor, again we object to the details.
 "THE COURT: I'll allow the question whether he was represented by attorney or not.
"Q. (By Mr. Hunt) Did you have an attorney?
"A. No, sir."
It is to be seen therefrom that in each of the three instances in which an objection was made by the State to a question by defendant, the objection was made after the question was asked, that in each of the two instances in which a ruling adverse to defendant was indicated by the court, the answer was not excluded from the consideration of the jury, and no request was made by the State for the exclusion thereof. We find, in accordance with Watson v. State, 15 Ala. App. 39, 72 So. 569,571 (1916), and Smith v. State, 40 Ala. App. 393, 114 So.2d 295,298 (1959), that whatever error, if any there was, in sustaining the State's objection to the question, the error was without injury to the defendant. In Watson v. State, supra, at72 So. 571, it was held:
 "The witness J.A. Green, in answer to the question asked by defendant's counsel, `If there had been any pistol shot could you have heard it,' answered, `Yes, sir;' and while objection to the question after it was answered and sustained by the court, the answer was not excluded; and the ruling, if error, was without injury."
Appellant's only other assertion of error pertains to a portion of the defendant's cross-examination of Charles Ray Gibson as follows:
 "Q. Did Terry Word have a shotgun when he came to your house?
"A. No, sir.
"Q. Did he get one out of his car at any time there?
"A. No, sir.
 "Q. What was the first thing that was said about this Camaro?
 "A. Well, it had already been by there, you know, back over there. It was over at my house the night before. *Page 1378 
"Q. And do you know whose car that was?
"A. It belonged to the Michaels.
"Q. And do you know which particular Michael?
 "A. No, sir, I don't know which particular one it belongs to, but I know it belongs to one of them.
 "Q. That car had been run to your house the night before?
"A. Yes, sir.
"Q. What happened over there the night before?
"A. He pulled down in my drive —
 "MR. SANDLIN [State's attorney]: I am going to object to what happened the night before. It is irrelevant and it is too far removed from the point in time.
 "MR. HUNT: [Defendant's trial attorney]: They went into it on direct and we want to cross-examine him about it.
 "MR. SANDLIN: Judge, I didn't ask any questions about what happened before.
 "MR. HUNT: There is some testimony about a Camaro and we want to go into that.
 "THE COURT: I think what happened the night before would be irrelevant unless there is some showing it was tied on I would sustain it.
 "Q. (By Mr. Hunt): What did the Camaro do that Sunday?
"A. That Sunday?
"Q. Yes, sir.
 "A. Well, he was over there around that church house, you know, up behind Stanley's house. They had been parking their cars over there and coming down through the woods and shooting at us one night.
"Q. What night was that?
"A. That on a Tuesday night a week or so before.
 "Q. And there had been shooting on this particular Sunday?
"A. No, sir."
We find no error prejudicial to defendant in the conditionally qualified ruling of the court that gave defendant the opportunity to show, if he could, that "what happened over there the night before" was not so disconnected from the issue on trial, and thus not so remote in time as to make it inadmissible in evidence, which defendant's attorney apparently utilized to the benefit of defendant as fully as possible. InRobinson v. State, DeCarlo J., Ala.Cr.App. 405 So.2d 1328,1334, cert. denied, 405 So.2d 1334 (1981), we find:
 "It is our judgment, therefore, that the trial court acted to exclude evidence which appeared to be remote. The exclusion of remote evidence is within the discretion of the trial judge, Hembree v. City of Birmingham, Ala.Cr.App., 381 So.2d 664 (1980), and his decision will not be overturned on appeal in the absence of gross abuse. Gamble, McElroy's Alabama Evidence, § 21.01 (2) (3d ed. 1977)."
We have considered all issues raised by appellant and find no error prejudicial to defendant as to any of them. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur. *Page 1379