Floyd Coleman, appellant, was indicted for the offense of robbery when the victim is intentionally killed. Ala. Code § 13-11-2 (a)(2) (1975).[1] He was duly arraigned and pleaded not guilty. A jury found him guilty as charged in the indictment. After conclusion of the guilt-finding phase of the trial, appellant, with advice of counsel, and the prosecuting attorney acting for the State, waived argument and the taking of testimony at the sentencing hearing before the jury and stipulated that the case be submitted to the jury for fixing its recommendation as to punishment after proper instructions by the trial court. After being properly instructed, the jury recommended punishment at life imprisonment without provision for parole. Immediately thereafter, on June 17, 1983, the trial court found Coleman guilty and sentenced him to be imprisoned in the penitentiary for life without provision for parole. This appeal followed.
About 2:00 p.m., February 1, 1977, Joseph Elias Garnem, owner and operator of the Radio Shack in Irondale, was robbed and shot in the stomach with a shotgun. He was shot inside his place of business, and he collapsed on the sidewalk just outside the front door. He died the next day as a result of the shotgun wound. A check of the cash register and business records revealed that $533.98 in cash and checks was missing.
There were no eyewitnesses to the actual shooting. The victim made several statements to persons assisting him at the scene. It was apparent that the victim knew he was seriously wounded and thought he was dying. He engaged in almost continuous praying until he was removed to the hospital. He kept repeating over and over, "Oh, Mary, Mother of God, please help me." The persons attempting to help him, joined him in prayer. He stated over and over, "I gave him the money and I don't know why he had to shoot me." He stated that he did not know the person that shot him, but that he was black. He stated that one person came into his store while his brother was present and left, and that after his brother left, another person came in and robbed him. At the hospital the victim stated that the man that robbed and shot him was black, about 5'8" in height, of medium build, had braided hair, and had some facial hair. He also stated that he was carrying a sawed-off shotgun. At the hospital the victim told his brother, Antwan Garnem, that he was in "bad shape" and asked him to take care of his wife and children.
The victim's brother, Antwan Garnem, happened to be in the Radio Shack shortly before the shooting. While there he observed a "skinny" black man about nineteen years of age enter the store. The man asked to see a radio, remained in the *Page 1383 
store about five minutes, and left without making a purchase. Garnem subsequently identified this person, whose name was Reginald Young. As Garnem was leaving the store, he and his brother, the victim, engaged in a conversation on the sidewalk near the entrance to the store. He observed three black men near the store and recognized one of them as being the person he had just seen in the store. Their actions made him "curious" and he asked his brother about them. One of the men was looking away from them toward a parked car, and he could not see him well. The other man had plaited hair, a short beard, and a mustache. He observed the man for about three minutes, and when the man saw him looking, the man turned his back. At trial, Garnem made a positive in-court identification of appellant as being the man he had seen that day. Garnem had also picked appellant's photograph from a photographic array prior to testifying in court.
Reginald Young testified that he, Dwight Copeland, and appellant went to the shopping center in an automobile; that they parked near the Radio Shack; that appellant told him to go in the Radio Shack and "check it out"; that he did so and came out and told appellant that it was not "hip to go in right now." He stated that appellant went in the store and came back in three to three and a half minutes; that he had a sawed-off shotgun and some money in his hand and that the money had blood on it. He further testified that appellant stated, ". . . I shot the man, it was an accident, I don't know what happened or whether the gun went off. . . . I didn't mean to shoot the man." Young stated that appellant split the money with Young and Copeland.
Dwight Copeland also testified for the State and his testimony was substantially the same as Reginald Young's. He testified that Young went in the Radio Shack to "case" it at the suggestion of appellant. He stated that appellant entered the store and came running back to the car in about eight minutes. He had a sawed-off shotgun, money in his hand, blood on his hand, and a "stocking cap" over his head. Appellant said that he had shot someone. Copeland looked in the gun and saw that a shell had been fired. Copeland also stated that they divided the money.
Young, Copeland, and James Charles Wilson, Jr., testified about another robbery which occurred about two and a half hours prior to the robbery and shooting at the Radio Shack. They testified that earlier that day, Young, Copeland, Wilson, appellant, and John Jackson drove to Langley's Grocery for the purpose of robbing it. Copeland, Young, and appellant entered the store. Wilson and Jackson remained in the car with the motor running. Copeland wielded the sawed-off shotgun on this occasion. After obtaining the money, Copeland struck an apparent customer over the head with the gun. After the robbery they spent the money on alcohol. Discussions were held about another place to rob. Appellant wanted to "keep robbing." Young, Copeland, and appellant obtained another automobile and went to the Radio Shack. Wilson testified that he saw Young, Copeland, and appellant later that day around 5:00 p.m., and that appellant told him that he "had shot a man, but he was sorry, he wasn't trying to do it." The record shows that at the time of trial John Jackson was deceased.
A warrant for the arrest of appellant was issued February 17, 1977, and he could not be found in Alabama. He was arrested in California, January 10, 1982, on a fugitive warrant and returned to Alabama. This accounts for the delay between the indictment and trial.
Appellant called five witnesses, all police officers, in an apparent effort to cast doubt upon the thoroughness of the police investigation. Appellant's defense consisted chiefly of vigorous cross-examination of the State's witnesses in an effort to impeach and discredit the testimony of Young and Copeland and the identification of appellant by Garnem. Appellant did not testify. A statement *Page 1384 
by defense counsel in final summation appears to correctly characterize appellant's complaint, "if they are going to try one, try them all. Selective prosecution is what it amounts to."
Upon conclusion of the State's case-in-chief and after all the evidence was in and both sides rested, appellant moved for judgment of acquittal. The record reflects that no grounds were stated or arguments presented. The motions were overruled by the trial court.
Appellant raises four issues on appeal.
 I
Appellant first contends that the trial court committed reversible error when it overruled his objections to the admission of testimony relating to the robbery of Langley Grocery Store. He argues that this was evidence of a distinct and independent crime and not admissible under the general exclusionary rule which prohibits the introduction of such evidence where the only probative function is to show bad character, inclination or propensity to commit the type of crime for which an accused is being tried. Appellant citesWilliams v. State, 350 So.2d 708 (Ala. 1977), in support of his contention. The trial court admitted the testimony as being of the res gestae and constituting a continuing course of conduct. The trial court in admitting the testimony apparently relied on our holding in Summers v. State, 348 So.2d 1126
(Ala.Crim.App.), cert. denied, 348 So.2d 1136 (Ala. 1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773
(1978).
The general rule of law is that evidence of other or collateral crimes is not admissible as substantive evidence to establish the guilt of the accused of a particular crime, but exceptions to this rule exist. Twilley v. State, 472 So.2d 1130
(Ala.Crim.App. 1985); Miller v. State, 405 So.2d 41
(Ala.Crim.App. 1981); Thompson v. State, 374 So.2d 377
(Ala.Crim.App. 1978), affirmed, 374 So.2d 388 (Ala. 1979); C. Gamble, McElroy's Alabama Evidence, § 69.01 (1)-(11) (3d ed. 1977).
In McElroy's at § 70.01 (24), we read:
"(a) General exclusionary rule applied
 "In a prosecution for robbery, evidence of accused's commission of another robbery is not admissible if the only probative function of such evidence is to prove the accused's bad character and that such character would lead to the commission of the now-charged robbery.
 "Evidence of accused's commission of other crimes which tends to prove his guilt, other than through the medium of his bad character, is admissible under any one of the following exceptions to the above general exclusionary rule. [Citations omitted.]
"(b) Res gestae
 "Prior and subsequent criminal acts of the defendant are admissible in a robbery prosecution if such crimes fall within the res gestae of the now-charged crime. This is sometimes referred to as the `one continuous transaction' exception to the general exclusionary rule. [Citations omitted.]"
In the instant case, the record discloses that on the same date and prior to the commission of the instant offense, appellant Young, and Copeland had robbed Langley Grocery. The grocery store was from ten to fifteen miles from the Radio Shack. Two other person were with them during the Langley Grocery robbery, James Charles Wilson, Jr., and John Jackson, who remained in the automobile while appellant, Young, and Copeland went inside and actually carried out the robbery. The trio had planned the robbery earlier in the day, and Young had entered the store first for the purpose of "casing" it. After the Langley Grocery robbery, appellant wanted to "keep robbing." Approximately two to two and a half hours after the Langley Grocery robbery, appellant, Young, and Copeland drove to the shopping center in Irondale, where the robbery-murder *Page 1385 
occurred at the Radio Shack. Young again performed the function of "casing" the store. Appellant then entered the store with the sawed-off shotgun and carried out the robbery, fatally shooting Mr. Garnem in the process. Both crimes were committed within a period of two and a half hours, within a distance of fifteen miles, and by the same three persons. A reasonable inference to be drawn from the evidence is that the trio were out on a robbery spree.
We find that the evidence of the robbery of Langley Grocery was admissible as part of the res gestae of a continuous criminal adventure. The trial court did not err in overruling appellant's objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which defendant is charged. Parsons v. State, 251 Ala. 467, 38 So.2d 209 (1948);Jackson v. State, 229 Ala. 48, 155 So. 581 (1934); Lowe v.State, 134 Ala. 154, 32 So. 273 (1901); Miller v. State, supra;Minnifield v. State, 397 So.2d 189 (Ala.Crim.App.), cert. denied, 397 So.2d 195 (Ala. 1981); Thompson v. State, supra;Howard v. State, 371 So.2d 475 (Ala.Crim.App. 1979); Moseley v.State, 357 So.2d 390 (Ala.Crim.App. 1978); Summers v. State, supra; 1 Wharton's Criminal Evidence, § 252 (C. Torcia 13th ed. 1972); McElroy's, supra.
The case of Williams v. State, supra, relied on by appellant is distinguishable from the case at bar on the facts. InWilliams the defendant twice robbed the same store. The robberies were a week apart. Under those circumstances it would be unreasonable to conclude that the two robberies were part of one continuous transaction.
 II
Appellant next contends that reversible error was committed by the trial court in denying his motion for a judgment of acquittal due to insufficient corroboration of the testimony of the accomplices.
Section 12-21-222, Code of Alabama 1975, provides as follows:
 "A conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof is not sufficient."
In C. Gamble, McElroy's Alabama Evidence, § 300.01, we read:
"(7) Sufficiency of corroborative evidence in general
 "To warrant submission of the case to the jury, it is not necessary that the corroborative evidence be strong, or that it alone be sufficient to warrant a finding of the defendant's guilt. The corroborative evidence may be entirely circumstantial. One of the most commonly found statements, as to the sufficiency of the corroborative evidence, is that the test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating evidence of the accomplice and then examining remaining evidence to determine if there is sufficient incriminating evidence tending to connect defendant with the commission of the offense; if such evidence is found, there is sufficient corroboration. [Citations omitted.]
 "(8) Corroboration of specific fact testified to by accomplice not required
 "The statutory requirement of corroboration of an accomplice does not exact that the corroborative evidence be of some specific fact or circumstance to which the accomplice has testified. Testimony by a person, who is not an accomplice, substantially tending to connect the defendant with the commission of the offense is sufficient corroboration to take the case to the jury. [Citations omitted.]
 "(9) Accused's admission or confession as corroboration of accomplice's testimony *Page 1386 
 "It has been held that non-accomplice evidence of an admission or confession by the accused is sufficient corroboration of an accomplice's testimony to sustain a conviction of the accused. [Citations omitted.]
 "(10) Accused's consciousness of guilt as corroboration of accomplice's testimony
 "Evidence of conduct by the accused, which manifests in him a consciousness of guilt of the offense charged, has been held sufficient corroboration of an accomplice's testimony to sustain a conviction of the accused. Thus, non-accomplice evidence of flight by the defendant . . . is sufficient corroboration to take the case to the jury. [Citations omitted.]
". . . .
 "(14) Proximity of accused to the scene of the crime as corroboration of accomplice's testimony
 "Proximity to the scene of the crime is, in a way, a part of the opportunity to commit the offense but non-accomplice evidence of mere opportunity alone, in the absence of circumstances giving an extraordinary guilty indication to the opportunity, is not a sufficient corroboration to take the case to the jury. If, however, the accused is in close proximity to the crime and there is other evidence indicating guilt, such a combination of evidence is sufficient to corroborate the testimony of an accomplice. Non-accomplice testimony, for example, that the defendant was in the company of the accomplice near the scene of the crime about the time of its commission, coupled with non-accomplice testimony that the defendant sought to have the accomplice help him out of his trouble; or that the defendant and the accomplices were seen near the place where the crime occurred, going towards that place, or that the accused and accomplice, on the night of the charged burglary, were seen going in the direction of the premises burglarized; or of the defendant's proximity to the place of the charged burglary, immediately before and after the burglary and his hiding with the accomplice is a sufficient corroboration. [Citations omitted.]"
See also Andrews v. State, 370 So.2d 320 (Ala.Crim.App.), cert. denied, 370 So.2d 323 (Ala. 1979), for a recent summary of the law concerning corroboration of an accomplice's testimony.
In the instant case, the State contends that the testimony of Garnem, Wilson, and McSween established sufficient corroboration of Young's and Copeland's testimony for the case to go to the jury. We agree. Garnem's testimony places appellant near the Radio Shack just prior to the robbery-murder. Garnem also identified accomplice Young as being in the Radio Shack, and later near the Radio Shack in the company of appellant a short time before the robbery. The location of their automobile near the side of the building at the waste "dumpster" and the suspicious manner in which they were acting caused him to notice them. Wilson testified that around 5:00 p.m. on the day of the robbery, appellant told him that he had shot a man. He also testified that after the Langley Grocery robbery appellant, Young, and Copeland left together. Wilson's testimony strengthens Young's and Copeland's testimony. McSween gave testimony of appellant's flight following the robbery-murder.
Evidence of appellant's proximity to the scene of the crime, opportunity to commit it, associations with the admitted accomplices at or near the crime scene just prior to the robbery-murder, admission that he had shot a man, and flight constitutes sufficient corroboration of the accomplices' testimony within the statute forbidding conviction for a felony on the uncorroborated testimony of an accomplice. Harris v.State, 420 So.2d 812 (Ala.Crim.App. 1982); Andrews v. State, supra; Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973);Freeman v. State, 41 Ala. App. 512, 138 So.2d 56 (1961);Cheatwood v. State, 22 Ala. App. 165, 113 So. 482, cert. denied,216 Ala. 692, 113 So. 915 (1927). *Page 1387 
Even though we have addressed this issue, we note that the record does not reflect that appellant stated any grounds for his motions for judgment of acquittal. In view of this, it would appear that appellant's motions for a judgment of acquittal failed to preserve the issue for review. See Maxwellv. City of Mobile, 439 So.2d 715 (Ala. 1983).
 III
Appellant next contends that the trial court's denial of his motion to suppress the in-court identification of him by Antwan Garnem was reversible error. He argues that the out-of-court identification procedure was unduly suggestive and unreliable and, therefore, tainted the in-court identification.
This court in the recent case of Cochran v. State, [Ms. 6 Div. 886, April 24, 1984] (Ala.Crim.App. 1984), aff'd in part, rev'd in unrelated part, [Ms. 83-1044, Nov. 8, 1985] (Ala. 1985) opinion by Presiding Judge Bowen, reviewed the legal requirements for determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony. In Cochran, we stated:
 "There exists a due process right to the exclusion of unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Stovall v. Denno, 388 U.S. 293
[87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967). The primary focus in the due process inquiry is on the reliability of the identification and identification evidence derived from an unnecessarily suggestive source need not be excluded if the totality of the circumstances indicates that it is reliable. Manson v. Brathwaite, 432 U.S. 98 [97 S.Ct. 2243, 53 L.Ed.2d 140] (1977).
 "In Manson, the Supreme Court adopted the five factors enumerated in Neil v. Biggers, 409 U.S. 188
[93 S.Ct. 375, 34 L.Ed.2d 401] (1972), to determine the reliability of the identification: the witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention at the time of the crime; the accuracy of the witness' prior description of the criminal; the witness' level of certainty when identifying the suspect at the confrontation; and the length of time between the crime and the confrontation.
 "After Manson, courts have employed a two-step analysis to determine whether due process has been violated by the admission of identification testimony. `A defendant first must prove that the identification procedure was unnecessarily and impermissibly suggestive, and courts then will consider the reliability of the identification by balancing the Biggers factors against the suggestiveness of the procedure.' Project: Thirteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1982-83, 72 Geo.L.J. 249, 334 (1983), citing United States v. Briggs, 700 F.2d 408, 412 (7th Cir.), cert. denied, 461 U.S. 947, 103 S.Ct. 2129, 2463 [77 L.Ed.2d 1307] (1983); Brayboy v. Scully, 695 F.2d 62 (2d Cir. 1982), cert. denied, 460 U.S. 1055, 103 S.Ct. 1505
[75 L.Ed.2d 934] (1982) (`Since the identification procedure was not impermissibly suggestive, the issue of the reliability of Kolkmann's identification of Brayboy is not before us.'); United States v. Harper, 680 F.2d 731, 734 (11th Cir.), cert. denied, 459 U.S. 916, 103 S.Ct. 229 [74 L.Ed.2d 182] (1982) (`First, as a threshold inquiry, the Court must decide whether the identification procedure was unnecessarily suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification.').
 "In Brazell v. State, 369 So.2d 25, 28-29
(Ala.Crim.App. 1978), cert. denied, *Page 1388 369 So.2d 31 (Ala. 1979), this Court observed:
 "`In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable. Manson, supra. This determination involves the application of a two-pronged test.
 `"[T]he required inquiry is two-pronged. The first question is whether the initial identification procedure was `unnecessarily' [Stovall] or `impermissibly' [Simmons v. U.S., 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247] suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been `unnecessarily' or `impermissibly' suggestive was so `conducive to irreparable mistaken identification' [Stovall] or had such a tendency `to give rise to a very substantial likelihood of irreparable misidentification' [Simmons] that allowing the witness to make an in-court identification would be a denial of due process." United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-914 (2d Cir. 1970)."'
Thus, the first inquiry, whenever the in-court identification of the defendant is challenged, is whether the out-of-court identification procedure used was unnecessarily or impermissibly suggestive; if it was not, then the inquiry stops. United States v. Sonderup, 639 F.2d 294 (5th Cir.), cert. denied, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 426
(1981); Cochran v. State, supra; Phillips v. State,409 So.2d 918 (Ala.Crim.App. 1981), citing Branch v. Estelle,631 F.2d 1229 (5th Cir. 1980). It is only when the pretrial procedures used are unnecessarily or impermissibly suggestive that the "totality of the circumstances" then need be analyzed underNeil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401
(1972). The State contends that the out-of-court identification complained of in the instant case was not unnecessarily or impermissibly suggestive and therefore did not give rise to a substantial likelihood of irreparable misidentification. We agree.
The record shows that Garnem picked a photograph of appellant from "a group of photographs" which were in a "row." No one identified the photograph of appellant to him prior to his identification. No one prior to his identification told him "anything" about the photo spread. No one told him that appellant's photograph was in the array. Garnem testified that he had never seen a photograph of appellant prior to viewing the spread. Garnem's viewing of the photographic array was on the second day of the trial; however, there is nothing in the record to indicate that Garnem saw appellant in the courtroom prior to being shown the photographs.
When an in-court identification is shown to have a basis independent of any pre-trial identification or confrontation, it is properly admitted into evidence. Jackson v. State,414 So.2d 1014 (Ala.Crim.App. 1982); Matthews v. State,401 So.2d 241 (Ala.Crim.App.), cert. denied, 401 So.2d 248 (Ala. 1981).
Garnem's in-court identification was properly admitted, as it was based on a source independent of the photographic array. Garnem testified, "If I did not see him like he was, I would not have identified him. But I saw him just like the picture when he was standing outside Radio Shack. The face I saw at Radio Shack is what I identified." His identification of appellant was strong and positive and obviously based on observations made at the scene shortly before the robbery. He testified that he stood in front of the Radio Shack and talked with his brother, the victim, just prior to the robbery-murder, and that while standing there he observed three black men nearby acting in a suspicious manner. He commented to his brother about them. They were apparently parked in an odd *Page 1389 
place, which was at the side of the building. Garnem identified one of them as Young and the other as appellant. He was very close to them and observed them with some interest for about ten minutes. Garnem was "curious" about what was going on.
There is nothing in the record pertaining to the out-of-court identification which would be unnecessarily or impermissibly suggestive so as to create a substantial risk of misidentification and thus taint the in-court identification of appellant by Garnem. Further, we find in the record an independent basis for the in-court identification. The trial court properly denied appellant's motion to suppress.
The six year lapse of time from the date of the incident until trial and the description given the police by Garnem at the time of the incident go to his credibility as a witness. It was for the jury to weigh the credibility of his identification.
 IV
Finally, appellant contends that he was denied due process by the State's suppression of exculpatory evidence which should have been produced pursuant to Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He specifically complains about the State's failure to furnish information concerning any "deals" made between the State and the accomplices for the purpose of obtaining their cooperation, and about fingerprint evidence.
Appellant asserts that the prosecution had represented that no agreements had been made between the State and accomplices Young and Copeland. However, after the trial was under way, it was discovered that Copeland had been granted immunity from the Radio Shack robbery-murder in exchange for his testimony. This information was made known to appellant's counsel prior to Copeland's testifying against appellant. Appellant concedes that the prosecuting attorneys were either mistaken as to Young and Copeland's having made no "deals" or were ignorant of the fact. Appellant contends that had the information been produced when ordered by the trial court, it would have enabled him to make a more vigorous attack on the credibility of the accomplices.
Appellant further contends that the prosecuting attorneys represented that there was no exculpatory fingerprint evidence, and that, relying upon this representation, he did not subpoena the fingerprint or evidence technician who dusted the scene for prints. He asserts that there "may" have been prints that would have been highly favorable to him if produced.
In Knight v. State, 478 So.2d 332 (Ala.Crim.App. 1985), we stated:
 "`The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.' United States v. Bagley, ___ U.S. ___, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481
(1985).
 "`A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. . . . Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt.'
 "California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984).
 "In order to establish a Brady violation, appellant must prove: `(1) The prosecution's suppression of evidence; (2) The favorable character of the suppressed evidence for the defense; (3) The materiality of the suppressed evidence.' Monroe v. Blackburn, 607 F.2d 148, 150 (5th Cir. 1979). See also Killough v. State, 438 So.2d 311 (Ala.Crim.App. 1982), rev'd on other grounds, 438 So.2d 333 *Page 1390 
(Ala. 1983). . . . `If evidence highly probative of innocence is in [the prosecutor's] file, he should be presumed to recognize its significance, even if he has actually overlooked it.' United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342
(1976). See also Robinson v. State, 405 So.2d 1328
(Ala.Crim.App. 1981). . . .
 "The United States Supreme Court recently stated in Bagley, ___ U.S. at ___, 105 S.Ct. at 3384:
 "`The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'"
The record in the instant case fails to show that the prosecution suppressed evidence as alleged by the appellant. Young testified that he had not been granted immunity. He was indicted for the robbery of the Radio Shack, tried by a jury, and convicted. There had been a turnover in the personnel of the District Attorney's office and it was obvious that the State had some difficulty in locating the information requested, if in fact it existed; however, it is clear from a reading of the record pertaining to this issue that there was no attempt on the prosecution's part to conceal the requested information. After the trial had commenced and the prosecuting attorneys had gone over the files of the accomplices with the judge, it was concluded that Copeland had apparently been granted immunity from prosecution for the robbery-murder at the Radio Shack. He testified, however, that he had been convicted of the Langley Grocery robbery and received a sentence of ten years. This was known by appellant prior to his cross-examination of Copeland, and Copeland was thoroughly cross-examined concerning any deals he may have made with the State. He admits that he had been granted immunity from the Radio Shack robbery-murder in return for this testimony. It further appears that appellant did not attempt to compel production until the week of the trial. There is no reason to believe that had the information concerning Copeland been known earlier the results of the proceeding would have been different. The grant of immunity to Copeland was before the jury for its consideration.
The record fails to show that the prosecution suppressed evidence of fingerprints. The fingerprint technician, J.W. Cooley, dusted the scene for prints. The record indicates that he lifted some latent prints and turned them over to a fingerprint expert. The only prints identified were of the victim. The other prints were too "smudged" to make an identification. Appellant implies that other prints "may" have been lifted which would have been beneficial to his defense, if produced. A careful reading of the testimony of the witnesses in reference to prints leads to the conclusion that none of the latent prints from the scene were identified as being appellant's, and that the only prints identified were of the victim. Appellant's suggestion that the State's attorney and the officers have suppressed fingerprint evidence is unsupported in the record. It is reasonable to conclude that the fingerprint evidence alluded to by appellant simply did not exist. If there was any delay in appellant's receiving the fingerprint evidence that did exist, it did not prejudice his case. The fingerprint evidence, including the fact that none of the prints lifted at the scene were appellant's, was before the jury.
We find no merit to this contention of appellant. There was no Brady violation here.
We have carefully searched the record for error injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] The death penalty statute which proscribed this conduct was enacted as 1975 Ala. Acts 701, No. 213 (September 9, 1975) (effective March 7, 1976). This provision was recodified without changes as § 13A-5-31 (a)(2), Code of Alabama 1975 (Blue Supplement) (effective June 1, 1979), and repealed July 1, 1981; however, the Act repealing the provision provides that the repeal does not affect the application of pre-existing law to conduct occurring before the effective date of the Act. 1981 Ala. Acts 203, No. 81-178, §§ 19, 20. The legislature enacted a new death penalty statute simultaneously with the repeal of the old statute. 1981 Ala. Acts 203, No. 81-178. The new death penalty statute is codified as Ala. Code § 13A-5-39 through13A-5-59 (1975). The incident giving rise to this indictment occurred on February 1, 1977. Appellant was indicted May 9, 1977, and reindicted February 11, 1983. *Page 1391