969 So.2d 169 (2006)
STATE of Alabama
v.
Daniel Wade MOORE.
No. CR-04-0805.
Court of Criminal Appeals of Alabama.
July 21, 2006.
*170 Troy King, atty. gen., and Corey L. Maze, Beth Slate Poe, and Donald G. Valenska II, asst. attys. gen., for appellant.
James Timothy Kyle, Decatur; and Sherman B. Powell, Jr., Decatur, for appellee.
McMILLAN, Presiding Judge.
The State of Alabama appeals the circuit court's dismissal of the capital-murder indictment returned against Daniel Wade Moore by a Morgan County grand jury.
In November 2000, Moore was indicted for murdering Karen Croft Tipton during the course of a robbery. He was reindicted in May 2002 for five counts of capital murder for murdering Tipton during the course of committing a rape, a sexual abuse, a kidnapping, a robbery, and a burglary. Moore was convicted of four counts of capital murder. The jury recommended a sentence of life imprisonment without the possibility of parole. The circuit court chose not to follow the jury's recommendation but instead sentenced Moore to death.
Moore moved for a new trial alleging that the State had violated the United States Supreme Court's decision in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose exculpatory evidence. The circuit court granted Moore's motion and scheduled the case for retrial.
The State filed a petition for a writ of mandamus in this Court attacking the circuit court's ruling granting Moore a new trial. See Rule 21(a), Ala.R.App.P. A majority of this Court requested that the respondent answer the allegations contained in the State's mandamus petition. Judge Thompson filed a response that stated, in part:
"Because of the violations of the discovery order, the undersigned seriously considered dismissing the case with prejudice. However, the Court feels that justice would not be served to do so, that the victim is entitled to her day in court and the defendant is entitled to a fair trial. A dismissal of the case would serve no purpose other than to warn the prosecution that the courts in this State will not tolerate violations of its discovery orders. Whether or not the violations were intentional or simply the result of neglect, the Court cannot say. The bottom line is that they did in fact occur and that the only possible way to correct these violations requires that this case be tried again at the earliest possible date."
(C.R. 916-17.) We then denied the extraordinary petition. State v. Moore, 897 So.2d 1248 (Ala.Crim.App.2003) (table). A similar mandamus petition was filed in the Alabama Supreme Court. That court also *171 denied relief. State v. Moore, (No. 1030218, November 6, 2003).
Moore then moved that the circuit court dismiss the capital-murder indictment. He alleged that he could not receive a fair retrial because of the prosecutor's many Brady violations. Fifteen months after the motion was filed the circuit court dismissed the capital-murder charges and ordered that Moore be immediately released from the Morgan County jail. The State appealed pursuant to Rule 15.7, Ala. R.Crim.P., and moved that we stay enforcement of the circuit court's order directing Moore's immediate release from custody. We granted the State's motion pursuant to Rule 15.7(d), Ala.R.Crim.P.
The State presented the following evidence at Moore's trial: On March 12, 1999, Karen Tipton's nude body was discovered in her house in Decatur. Tipton had been beaten in the head and stabbed over 20 times in her neck and chest. Various items had been taken from the house including jewelry, a video camera, and Tipton's purse.
The investigation focused on Moore after he confessed to his uncle that he had been in the Tipton house during the murder. He claimed that he was on the second floor when one of his accomplices grabbed Tipton, cut her throat, and stabbed her.
Evidence was also presented indicating that Moore had worked for the security company that had installed Tipton's security system and that he had been in the Tipton house. The State also presented evidence indicating that on the night of Tipton's murder Moore had purchased a large quantity of cocaine with cash and a new video camcorder.
Two hairs not belonging to Tipton had been discovered near Tipton's body. Forensic tests excluded 99.8% of the population as the source of the hairs. Moore was in the .2% of the population that could not be excluded.
Moore's defense was that he did not commit the murder. His entire strategy consisted of casting doubt on the State's evidence and shifting the blame to other individuals who, he said, had the means, motive, and opportunity to kill Tipton.

I.
The State argues that the Double Jeopardy Clause does not bar the State from retrying Moore for capital murder. It further asserts that the circuit court's order dismissing the charges is erroneous because, the State argues, the court applied the incorrect legal standard and ignored Alabama precedent.
The circuit court issued a lengthy order dismissing Moore's capital-murder indictment after finding that the prosecutor's intentional misconduct barred Moore's retrial under the Double Jeopardy Clause. The circuit court made the following findings of fact concerning the prosecutor's failure to disclose exculpatory evidence to Moore:
"During the discovery phase of this trial, counsel for the Defendant made repeated requests for copies of statements and other documents in the possession of agents from the Federal Bureau of Investigation. The Court ordered the prosecutor and the investigators to provide the Defendant's attorney with copies of all documents in their possession of whatever kind relating to the murder of Karen Croft Tipton. Repeatedly, Investigator Mike Pettey[[1]] and Prosecutors, Don Valeska and William Dill, denied the very existence *172 of any reports or documents prepared or generated by agents from the Federal Bureau of Investigation. The Court believed those representations made by the prosecution and took no further action to require the prosecution to produce the requested documents. This was done over the strenuous objections of counsel for the Defendant.
"After the Defendant was tried and convicted, Don Valeska produced to the Court a copy of a five page document that was faxed to him from the Federal Bureau of Investigation. The Court then learned that Mr. Valeska had actual knowledge of this document prior to his fervent denial that any such documents or reports existed. It was based on this fact that the Court granted the Defendant's Motion for New Trial.
"The Court later learned that the Federal Bureau of Investigation had, in fact, collected 245 pages of documents in an internal document, which was released to the Defendant's attorneys after the trial and conviction of the Defendant.
"During the trial of Daniel Wade Moore, the trial court sustained objections from the prosecution, which prevented counsel for the Defendant from asking Sarah Joyce Holden about conversations she had with the victim prior to her murder. After a new trial was granted, the trial court allowed counsel for the Defendant to conduct several depositions. One of the depositions taken was of Sarah Joyce Holden. Sarah Joyce Holden was a friend of the victim. In the days just prior to her murder, the victim told Ms. Holden that her burglar alarm system had been malfunctioning and that she, the victim, had disconnected said system so that she could sleep. Ms. Holden was interviewed by Investigator Mike Pettey following the murder of the victim, at which time she conveyed this information about the alarm system. Ms. Holden was also interviewed by prosecutors Don Valeska and William Dill prior to the trial of the Defendant. Ms. Holden prepared a written statement containing the aforementioned information.
"At no time prior to the trial of the Defendant was the defense provided with the information given by Sarah Joyce Holden nor was the defense provided with a copy of her written statement containing the same information. Additionally, the prosecution consistently denied the existence of this written statement.
"Pamela Brown Smith testified that she resided on Chula Vista Drive, S.W., Decatur, Alabama, prior to the death of Karen Tipton. She further testified that it was her custom and habit to leave her house around 2:40 p.m. to pick up her daughter at school and she routinely returned to her home at 3:30 p.m. This required her to pass the Tipton residence on her way to and returning from her children's school. She further testified that on March 12, 1999, the day of Karen Tipton's murder, the victim was standing at her mailbox getting her mail at or about 3:30 p.m., and that she was wearing jeans and a light colored shirt. Ms. Tipton's automobile, a white sports utility vehicle, was in the driveway at that time. Ms. Brown also stated that she saw a paving crew in the driveway next door, and they were near Chapel Hill Road completing the work they had been doing. She was also aware of the fact that the Tiptons had their driveway paved the previous day.
"Pamela Brown Smith called the Decatur Police Department to report the fact that she had seen Karen Tipton alive in her driveway at her mailbox at *173 3:30 p.m. on the day of her death. Ms. Smith asked to speak to the person in charge of the Tipton investigation. She recalls that the person she spoke to was male. She gave them her name, her address, and the information she had. She was told that they would get back in contact with her, but they never did.
"The defense was never provided with any information regarding Pamela Brown Smith or the statement she made to the person at Decatur Police Department regarding the time of the victim's death. All of the information provided by Pamela Brown Smith is consistent with other testimony provided by witnesses during the trial, including the type of clothing Karen Tipton was wearing prior to her murder and the progress and location of the paving crew.
"Pamela Brown Smith was never interviewed further by the Decatur Police Department and came forward after the trial of the Defendant when she learned that the investigators had estimated the time of death for Karen Tipton between 1:00 p.m. and 4:00 p.m.
"Investigators concluded that the victim encountered her offender between 1:00 p.m. and 2:30 p.m. Investigators further stated they knew that Mrs. Tipton ordinarily left her home at 2:30 p.m. to pick up her children at school.
"After Daniel Wade Moore was re-indicted on the 6th day of May 2002, Assistant Attorney General Don Valeska contacted the Federal Bureau of Investigation to attempt to locate an agent named Tom Near to testify in the Moore case on an unrelated issue. During those conversations, Mr. Valeska learned that two agents from the Federal Bureau of Investigation had come to Decatur, at the request of then Investigator Mike Pettey, `to assist' investigators from the Decatur Police Department, by gathering information to possibly produce a profile to help the investigators find the killer of Karen Tipton. Mr. Valeska first learned this in August or September of 2002, prior to the trial of Daniel Wade Moore that began on November 4, 2002. In early October 2002, Agent Carry Straub with the Federal Bureau of Investigation called Mr. Valeska stating he had been made aware of the fact that Mr. Valeska had made an inquiry of the Federal Bureau of Investigation regarding this case. Mr. Straub informed Mr. Valeska that he had something in his file and Mr. Valeska gave Mr. Straub the fax number at the Attorney General's office in Montgomery, Alabama. On or about October 11, 2002, Defendant's Motion to Dismiss Hearing Exhibit `5,' which consists of a four page synopsis of this case that had been compiled by the FBI plus a cover sheet was faxed from the FBI to Mr. Valeska nearly a month prior to the trial of the Defendant.
"Investigator Mike Pettey told Don Valeska prior to the trial of the case that he had sent questionnaires to various people connected to the case, had them fill out the questionnaires; and sent the information back to the Federal Bureau of Investigation. None of these materials were ever provided to the Defendant. Mr. Valeska did nothing prior to the commencement of the trial on November 4, 2002, to get a copy of this information from the Federal Bureau of Investigation or furnish it to the defense or inform the Court that he had discovered the documents existed.
"On October 30, 2002, the Court had hearings on motions filed by the defense requesting copies of information about an alleged Federal Bureau of Investigation report. On October 30, 2002, when questioned specifically by the Court regarding a Federal Bureau of Investigation *174 report, Assistant Attorney General Don Valeska, said to the Court, `There ain't no such thing as an FBI report.'
"Significant information is contained in the materials provided by the Federal Bureau of Investigation shown in Motion to Dismiss Hearing Exhibit `5' and `6' that should have been provided to the defense under the Court's order to the prosecution to allow access to the Defendant's counsel to all material relating to this case to which they had access. All of the material in question here passed through the hands of the investigators for the Decatur Police Department or the Assistant Attorney General Don Valeska and should have been provided to the defense as ordered by this Court.
"The Decatur Police Department denies that the FBI did any investigation in the present case. However, the Court has before it 245 pages of information that was collected by investigators from the Decatur Police Department and provided to the Federal Bureau of Investigation, yet a significant portion of that information was not provided to the defense as ordered by this Court. The prosecution, in fact, denied to the Court the existence of the documents which they collected and sent to the Federal Bureau of Investigation. Said documents and information were later discovered in 245 pages of documents collected by the FBI and shipped to Assistant Attorney General Don Valeska who only provided it to the Court after the Defendant was tried and convicted."
(C.R. 40-46.)

Facts
At the hearing on the motion to dismiss, Moore focused on the State's failure to disclose exculpatory statements made by two witnesses that, he argues, would tend to discredit the State's case and its failure to disclose 245 pages of materials that had been forwarded to the Federal Bureau of Investigation ("the FBI") by the Decatur Police Department.
The testimony established the following: Sara Joyce Holden, a friend of Tipton's, testified that she spoke with police after Tipton's murder. She said that Tipton complained to her on the Sunday before her murder that she was not getting any sleep because her security system had been malfunctioning. Tipton told her, she said, that she took the system out of the wall or that she "ripped" it out of the wall. Holden said that she could not specifically remember whether she told police what Tipton had told her about her security system but that she was sure that she did.
Pamela Brown Smith, a friend of Tipton's, testified that she saw Tipton on the day of her murder in front of her house getting her mail at approximately 3:30 p.m. She said that about one week after the murder she had telephoned the police and told them that she wanted to speak to someone about the Tipton case. Smith said that she told a male police officer, she could not identify the officer by name, that she saw Tipton at approximately 3:30 p.m. on the day of her murder walking to her mailbox. After Moore's trial, she said, she realized that the time of Tipton's death had been estimated at between 1:00 p.m. and 4:00 p.m. and that police had maintained that she confronted her attacker between 1:00 p.m. and 2:30 p.m. After the trial, Smith said, she contacted Moore's attorneys and told them about seeing Tipton on the day of the murder.
The State's prosecutor, Don Valeska, testified that he became aware of the FBI's involvement in the case after Moore was reindicted in May 2002. He said that in August or September 2002 he discovered that two FBI agents had been to Decatur *175 concerning the case. Valeska said that about one week before Moore's trial an FBI agent telephoned him and informed him that he had a file on the case. This FBI agent faxed a five-page document to Valeska. Also, in July 2003, Valeska received 245 pages of documents from the FBI. The information consisted mainly of "scan questionnaires" that were completed by the victim's family members and friends. These documents contained questions related to the respondent's knowledge of the victim and her habits and lifestyle. Specifically the questionnaires asked for information concerning: the length of the respondent's relationship with the victim and how they met, knowledge of the victim's family, the victim's style of dress and personal grooming, what the victim did in her spare time, the victim's likes and dislikes, the victim's lifestyle, the victim's number and type of friends, the victim's enemies or persons she disliked, the victim's reputation at home and work, the victim's sexual orientation, the victim's medical and mental-health history, any noticeable personal habits, her mode of transportation and how maintained, and any significant events that had occurred before the crime.
Valeska further stated that several weeks before Moore's trial Investigator Michael Pettey of the Decatur Police Department told him that he had forwarded materials to the FBI. It was Valeska's understanding that Decatur police had contacted the FBI's Violent Criminal Apprehension Program ("VICAP") to secure a profile of Tipton's killer. Pettey told him that he had asked the FBI for a profile and that a profile had never been made by the FBI. He further testified that he never intended to withhold exculpatory information and that he did not consider some of the materials to be exculpatory.
Investigator Pettey testified that in order to compile a profile on the killer, the FBI sent forms to be completed by the victim's family members and friends. He said that he distributed the forms, collected them, and forwarded them to an FBI agent. He testified several times that he did not keep any copies of the documents that were sent to the FBI. He said:
"It was information that they wanted for a profile. It wasn't anything we used in regards to the investigation of the homicide. The forms that they have, these VICAP forms, they ask for opinions and speculations and that sort of stuff, and that's not something that we use in regards to the investigation. Or if it's not factual then, you know, you don't incorporate it as part of your report."
(R. 3999.)
Barry Hamilton, a lieutenant with the Decatur police department, testified that the department asked the FBI for help with a profile of the killer and that all of the information that was collected at the FBI's request was forwarded to the FBI. It was the department's policy not to maintain copies of any materials forwarded to the FBI.
Dwight Hale, chief of detectives for the Decatur Police Department, testified that the FBI was contacted to complete a profile of Tipton's killer and various forms were sent to the FBI at its request. Hale said that the forms consisted of "personal information, some psychological type questions and stuff."
This Court has diligently examined the testimony from the hearing and the many motions related to this issue. There is no doubt that the prosecutor was aware that Investigator Pettey had forwarded materials to the FBI. While we cannot say that Valeska had personal knowledge of the contents of the materials forwarded to the FBI, Pettey's knowledge *176 of the contents is imputed to Valeska. "The knowledge of government agents working on the case, including a deputy sheriff, as to the existence of exculpatory evidence will be imputed to the prosecutor. Sexton v. State, 529 So.2d 1041, 1045 (Ala. Cr.App.1988)." Savage v. State, 600 So.2d 405, 407 (Ala.Crim.App.1992). Moreover, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[2]Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The rules of criminal discovery are not `mere etiquette,' nor is compliance a matter of discretion." State v. Scott, 943 S.W.2d 730, 735 (Mo.Ct.App.1997).

Legal Analysis
When discussing the legal principles that governed its decision to dismiss the indictment, the circuit court stated:
"The Fifth Amendment to the United States Constitution states that, `[no person shall] be subject for the same offence to be twice put in jeopardy of life or limb.' About the Double Jeopardy Clause, the courts have said: the Double Jeopardy Clause bars retrials where bad faith conduct by a judge or prosecutor threatens the harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict the defendant. United States v. Dinitz, 424 U.S. 600 (1976). It has been a longstanding principle in American jurisprudence that `the prohibition of the Double Jeopardy Clause is not against being twice punished, but against being twice put in jeopardy.' United States v. Ball, 163 U.S. 622[662], 669 (1896).
"Most of the cases reviewed by this Court relating to double jeopardy and facts similar to this case discuss mistrials as opposed to the granting of a new trial after the rendering of a guilty jury verdict. However, the Court can find no distinction between the two. A defendant is no less wronged by a jury finding him guilty after an unfair trial than he is by a failure to reach a jury verdict at all. A declaration of a mistrial is legally equivalent to the granting of a new trial in that the prior proceeding does not result in the adjudication of the case. Therefore, these principles will be treated as interchangeable by this Court.
"The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial request and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where `bad faith conduct by judge or prosecutor,' United States v. Jorn, [400 U.S. 470] 485 (1971)] threatens the `[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict the defendant.' United States v. Leonard, 593 F.2d 951, 954 (10th Cir.1979). See also Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). The United States Supreme Court makes it clear that under ordinary circumstances a defendant's request for a new trial (or mistrial) generally removes any Constitutional barrier *177 to a retrial. Ordinarily, a retrial would be necessary to protect the public's interest in fair trials designed to end in just judgments. However, the Supreme Court also recognizes that there may be exceptions to this general rule; rare cases involving circumstances which are attributable to prosecutorial misconduct and overreaching. Where prosecutorial overreaching exists, a defendant's new trial request does not remove the Constitutional barrier afforded by the Double Jeopardy Clause, preventing the retrial of the defendant. United States v. Jorn, 400 U.S. 470 (1971), United States v. Kessler, 530 F.2d 1246 (5th Cir.1976)."
(C.R. 48-49) (emphasis added).
The circuit court's legal analysis is inconsistent with this Court's holding in Robinson v. State, 405 So.2d 1328 (Ala. Crim.App.1981). In Robinson, we stated:
"Appellant cites United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), and United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (197[1]), in support of his contention that reprosecution should have been precluded by the Fifth Amendment protection against double jeopardy. He contends that the State's failure to turn over self-defense material prior to trial and its `knowing use of perjured testimony' at trial constituted prosecutorial bad faith which should have barred his retrial.
"In Dinitz and Jorn, the United States Supreme Court alluded to the general rule that a defendant who moves for a mistrial cannot claim double jeopardy when his motion is granted and he obtains a new trial. By his motion for mistrial, he is deemed to have consented to end the first trial and obtain another one.
"The court indicated, however, that if a defendant is forced to move for a mistrial because of `prosecutorial overreaching,' Dinitz, supra at 608, 96 S.Ct. at 1079, or `bad faith conduct by judge or prosecutor,' Jorn, supra at 485, 91 S.Ct. at 557, then he is not deemed to have elected to terminate his first trial and to obtain a new one. Instead, his motion is treated as a motion for mistrial by the prosecution and a retrial would constitute double jeopardy. Neither Dinitz nor Jorn, however, is applicable here since we are confronted not with a motion for mistrial, but with a motion for new trial. We therefore find the analysis of the mistrial cases of little value in determining whether double jeopardy bars reprosecution after a successful motion for a new trial. In our judgment, the reasoning of the cases finding no jeopardy problem with a new trial after reversal of a conviction is more apt here.
"Ordinarily, when one who has been convicted successfully seeks review of that conviction there is no double jeopardy impediment to a new trial. United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947); United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896).
"Although appellant's motion for new trial was addressed to the trial judge and was not, in contrast to Tateo, Resweber, and Ball, supra, a submission for appellate review, it was nevertheless a request for judicial scrutiny of his conviction. The granting of a motion for new trial by the trial court is analogous to the reversal of a conviction by an appellate court; both result from error at trial. See Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). When the cause for reversal is error at trial, as opposed to evidentiary *178 insufficiency, there is no double jeopardy upon a retrial. Burks, supra.
"In Burks, supra at 15, 98 S.Ct. at 2149, the United States Supreme Court observed the following:
"`[R]eversal for trial error, as distinguished from evidentiary insufficiency, . . . is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.'
"Appellant urges us to accept the rationale of the mistrial cases, maintaining that he would have moved for (and been granted) a mistrial had he known of the alleged prosecutorial misconduct during the first trial. This argument was considered and rejected in United States v. Barham, 608 F.2d 602 (5th Cir.1979).
"In Barham, supra, the Fifth Circuit Court of Appeals held that the government's knowing use of perjured testimony at the defendant's first trial did not bar a retrial after reversal of his conviction. The court determined that
"`[T]he prosecutor's conduct did not amount to prosecutorial overreaching or bad faith and that in any event double jeopardy bars a retrial after conviction only when the conviction is reversed for insufficiency of the evidence.' United States v. Barham, 625 F.2d 1221 (5th Cir.1980).
"Following the reasoning of Burks, supra, and Barham, supra, we hold that there was no double jeopardy impediment to appellant's retrial on the basis of the prosecution's alleged knowing use of perjured testimony at the first trial. Appellant received the relief to which he was entitled for error at his first trial  a new trial."
405 So.2d at 1331-32. Other jurisdictions follow the rationale employed by this Court in Robinson. See People v. Sales, 357 Ill.App.3d 863, 868, 294 Ill.Dec. 434, 438, 830 N.E.2d 846, 850 (2005) ("[C]ase law clearly contradicts defendant's contention that a mistrial and a new trial can be functionally equivalent."); Couch v. Maricle, 998 S.W.2d 469, 471 (Ky.1999) ("[C]learly double jeopardy concerns are not the same in the event of a mistrial as they are in the event a conviction is reversed on appeal or set aside upon the granting of a new trial."); United States v. McAleer, 138 F.3d 852, 856 (10th Cir.1998) ("The district court's decision to set aside the jury verdicts at Defendants' request nullified the original verdict just as a reversal on appeal would nullify a conviction. As a result, the `slate has been wiped clean' and double jeopardy does not bar retrial.").
In People v. Hooker, 96 Ill.App.3d 202, 204-05, 51 Ill.Dec. 800, 802, 421 N.E.2d 308, 310 (1981), an Illinois Court of Appeals thoroughly explained the distinction between mistrials and new trials stating:
"We reject the defendant's contention that mistrials and new trials are synonymous.
"A mistrial contemplates the premature termination of the trial. Where, for reasons deemed compelling by the trial judge, the ends of substantial justice cannot be obtained without discontinuing the trial, a mistrial may be declared without defendant's consent, and even over his objection. Gori v. United States (1961), 367 U.S. 64[364], 81 S.Ct. 1523, 6 L.Ed.2d 901. Where a mistrial is declared after jeopardy has attached, the defendant's valued right to have his *179 trial completed by a particular tribunal is necessarily implicated. United States v. Dinitz (1976), 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267. Where jeopardy has attached, the court must determine whether the declaration of a mistrial was required by manifest necessity or the ends of public justice. Illinois v. Sommerville[Somerville] (1973), 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425.
"In contrast to a mistrial, a motion for a new trial is designed to allow a defendant to seek a review of his conviction at the trial level[,] (People v. Pierce (1980), 80 Ill.App.3d 514, 35 Ill.Dec. 925, 400 N.E.2d 62)[,] and to provide the trial judge with an opportunity to correct alleged errors made during trial. People v. Edwards (1977), 49 Ill.App.3d 79, 7 Ill.Dec. 14, 363 N.E.2d 935. It provides for a fair and orderly procedure for post-trial review in the trial court and a trial court is vested with wide discretion in the matter of allowing the motion for a new trial which is granted.
"Clearly, a motion for a mistrial and a motion for a new trial are different and have different functions. Because a mistrial contemplates a premature termination of the trial, it requires more stringent standards than a motion for a new trial, which deals with a situation in which the trial has been completed and judgment rendered."
Based on Alabama precedent, Moore's retrial is not barred by the Double Jeopardy Clause because the first proceedings were terminated when the circuit court granted a motion for a new trial, and not a motion for a mistrial. See Robinson, supra.
However, assuming, for the sake of argument, that a mistrial and a new trial are functionally equivalent, we would still be compelled to find that the circuit court applied the incorrect legal standard in evaluating this issue. The circuit court relied on the United States Supreme Court's decisions in United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), and United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). However, the holdings in Dinitz and Jorn were significantly narrowed by the Supreme Court's subsequent decision in Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In criticizing its earlier holding in Dinitz, the United States Supreme Court in Oregon stated: "The language [quoted from Dinitz] would seem to broaden the test from one of intent to provoke a motion for a mistrial to a more generalized standard of `bad faith conduct' or `harassment' on the part of the judge or prosecutor." 456 U.S. at 674, 102 S.Ct. 2083. The Supreme Court then stated:
"[T]he circumstances under which . . . a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial."
Oregon v. Kennedy, 456 U.S. at 679, 102 S.Ct. 2083.
"Goading conduct is a material fact treated by the Supreme Court as necessary for the [Oregon v.] Kennedy [, 456 U.S. 667 (1982)] rule  the rule prohibiting a second prosecution  to apply. The Court noted that `[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion [ ] does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.' Id. Then the Court recognized that `language taken from [their] earlier opinions may well suggest *180 a broader rule.' [456 U.S. at 677, 102 S.Ct.] at 2090. But the Court concluded that a defendant, after a mistrial, could only successfully assert the defense of double jeopardy in `those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.' [456 U.S. at 679, 102 S.Ct.] at 2091."
Hawkins v. Alabama, 318 F.3d 1302, 1308 (11th Cir.2003). See also Commonwealth v. Simons, 342 Pa.Super. 281, 291, 492 A.2d 1119, 1124 (1985) ("In Oregon v. Kennedy, the United States Supreme Court chose to limit the availability of relief under the Double Jeopardy Clause by declaring that only misconduct intended to provoke a mistrial would constitute a bar to reprosecution."); State v. Diaz, 521 A.2d 129, 132 (R.I.1987) ("[T]he Court in Kennedy recognized only one exception to the general rule that a mistrial requested by a defendant does not bar a retrial."); Commonwealth v. Simons, 342 Pa.Super. at 287, 492 A.2d at 1123 ("[T]he United States Supreme Court held that only prosecutorial misconduct intended to provoke a mistrial would bar retrial under federal double jeopardy principles. Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The Court thus repudiated the notion that there are two separate types of prosecutorial misconduct that bar reprosecution. . . ."); United States v. McAleer, 138 F.3d at 856, quoting Kennedy, 456 U.S. at 673, 102 S.Ct. 2083 ("The Kennedy prosecutorial misconduct exception is a narrow one, designed to protect the defendant's right to `have his trial completed before the first jury empaneled to try him.'"); United States v. Lewis, 368 F.3d 1102, 1108 (9th Cir.2004) ("A narrow exception to this `motion for mistrial' rule exists where the government engages in prosecutorial misconduct `intended to provoke the defendant into moving for a mistrial.'").
Based on the Supreme Court's decision in Oregon v. Kennedy, a holding adopted by the Alabama Supreme Court in Ex parte Cochran, 500 So.2d 1179 (Ala.1985), the determination of whether a retrial is barred based on prosecutorial misconduct in a first trial comes down to one question  was the prosecutor's conduct intended to provoke a mistrial. The Alabama Supreme Court in Cochran stated:
"Defendant argues that the failure of the state to provide him the information on the witness is the type of conduct known as `prosecutorial overreaching,' which was condemned in United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), and he argues that it precludes a retrial. However, the most recent opinion on this subject, Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), expressly rejects this standard in determining whether a second trial is barred following a defendant's motion for mistrial. In Kennedy, the Court stated:
"`[T]he circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.'
"456 U.S. at 679, 102 S.Ct. at 2091."
500 So.2d at 1181-82.
There is no indication that the prosecutor's actions here were intended to provoke a mistrial. Indeed, it is apparent that the opposite is true.[3] "The prosecutor's *181 withholding of exculpatory evidence from the defendant may only be characterized as an overzealous effort to gain a conviction from the first jury and not as an attempt to subvert [the defendant's] `valued right' by bringing the case before a second jury." United States v. Coleman, 862 F.2d 455, 458 (3d Cir.1988). "[W]e do not believe the [Double Jeopardy Clause] may be invoked to supplement the remedies contemplated by Brady." 862 F.2d at 458.[4]
Upon application of the standard announced by the United States Supreme Court in Oregon v. Kennedy, we must conclude that the circuit court erroneously extended the protections of the Double Jeopardy Clause to bar Moore's retrial in this case. The circuit court's order conflicts with established precedent and is due to be reversed.

II.
The State also argues that "[r]egardless of whether a prosecutor acted in good faith or bad faith in violating Brady, the law provides a defendant with one remedy: a new trial." (State's brief at page 30.)
There is no constitutional right to discovery in a criminal case in Alabama. However, Rule 16, Ala.R.Crim.P., as adopted by the Alabama Supreme Court, specifically provides for discovery in criminal cases. Rule 16.5, Ala.R.Crim.P., addresses the sanctions that a court may impose for noncompliance with a discovery order. Rule 16.5, states:
"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such other order as the court deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."[5]
(Emphasis added.) Although dismissing the charges is not specifically cited as a sanction in Rule 16.5, this Rule gives a circuit court wide discretion in considering the manner and nature of relief it affords a defendant who has been denied discovery. While we are aware of no reported Alabama case that affirms the dismissal of an indictment based on a prosecutor's Brady *182 violation, it appears from the wording of Rule 16.5, Ala.R.Crim.P., that this sanction may be available based on the circuit court's supervisory powers.
In Government of the Virgin Islands v. Fahie, 419 F.3d 249 (3d Cir.2005), the federal district court reversed a lower court's dismissal of the charges against Fahie based on a Brady violation. The court stated: "Our research discloses no case where a federal appellate court upheld dismissal with prejudice as a remedy for a Brady violation." 419 F.3d at 254 n. 6 The court then discussed the various federal circuits and their individual responses to prosecutorial misconduct that necessitates a retrial. The court stated:
"Given the `societal interest in prosecuting criminal defendants to conclusion,' it is especially important in the criminal context that a court applying sanctions for violation of Rule 16 carefully assess whether dismissal with prejudice is necessary to exact compliance with discovery obligations. [United States v.] Coleman, 862 F.2d 455 [(3d Cir.1988)]. In particular, as discussed above, a court must look to both the need to undo prejudice resulting from a violation and the appropriate deterrent value of the sanction in each case.
"Other courts have considered the question of when a court may dismiss an indictment under its supervisory powers. The Ninth Circuit has held that `[d]ismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice.' United States v. Kearns, 5 F.3d 1251, 1253 (9th Cir.1993). It has suggested that prosecutorial conduct might satisfy those requirements even where it would fail to justify dismissal under Brady directly. See [United States v.] Ross, 372 F.3d [1097] at 1110 [(9th Cir.2004)]; United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir.1991). The Seventh Circuit has adopted a more restrictive approach, holding that a sanction under supervisory powers is only appropriate where the conviction could not have been obtained but for the failure to disclose exculpatory evidence. See United States v. Johnson, 26 F.3d 669, 683 (7th Cir.1994). At least two other circuits instruct courts to balance a number of factors in their choice of a sanction, including `the reasons for the Government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess.' United States v. Euceda-Hernandez, 768 F.2d 1307, 1312 (11th Cir.1985); see also United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988). While we appreciate the importance of all these factors, we believe that, to merit the ultimate sanction of dismissal, a discovery violation in the criminal context must meet the two requirements of prejudice and willful misconduct, the same standard applicable to dismissal for a Brady violation. Accordingly, we do not expect that trial courts will dismiss cases under their supervisory powers that they could not dismiss under Brady itself.
"Neither the trial court nor the Appellate Division systematically considered the factors relevant to a sanction for prosecutorial misconduct, and in particular, the two prerequisites to dismissal with prejudice."
419 F.3d at 258.
In United States v. Euceda-Hernandez, 768 F.2d 1307 (11th Cir.1985), the court stated:

*183 "In exercising its discretion, the district court must weigh several factors, and, if it decides a sanction is in order, should fashion `the least severe sanction that will accomplish the desired result  prompt and full compliance with the court's discovery orders.' United States v. Sarcinelli, 667 F.2d 5, 7 (5th Cir. Unit B 1982). See also [United States v.] Burkhalter, 735 F.2d [1327] at 1329 [(11th Cir.1984)]; United States v. Gee, 695 F.2d 1165, 1169 (9th Cir.1983) (citing Sarcinelli, supra). Among the factors the court must weigh are the reasons for the Government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess. Burkhalter, 735 F.2d at 1329; United States v. Hartley, 678 F.2d 961, 977 (11th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 and 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); Sarcinelli, 667 F.2d at 6-7.
". . . .
"The presence of a clear violation of a discovery order does not excuse a trial judge from weighing the factors cited above and imposing the least severe, but effective, sanction. The purpose of requiring the Government to disclose evidence is to promote `the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence.' Fed.R.Crim.P. 16 advisory committee note."
768 F.2d at 1312 (footnote omitted).
Our neighboring State of Florida in State v. Carpenter, 899 So.2d 1176 (Fla. Dist.Ct.App.2005), cautioned against dismissing the charges as a sanction for a Brady violation and aptly stated:
"Dismissal of an information is, however, an extreme sanction that should be used with caution, and only when a lesser sanction would not achieve the desired result. State v. Thomas, 622 So.2d 174, 175 (Fla. 5th DCA 1993). See also [State v.] Del Gaudio, 445 So.2d [605] at 608 [(Fla.Dist.Ct.App.1993)] (`Dismissal of an information or indictment is "an action of such magnitude that resort to such a sanction should only be had when no viable alternative exists"') (quoting State v. Lowe, 398 So.2d 962, 963 (Fla. 4th DCA 1981)). Before a court can dismiss an information for a prosecutor's violation of a discovery rule or order, the trial court must find that the prosecutor's violation resulted in prejudice to the defendant. Thomas, 622 So.2d at 175; Richardson v. State, 246 So.2d 771 (Fla.1971).
"`The obvious rationale for limiting the sanction of dismissal of criminal charges to only those cases where no other sanction can remedy the prejudice to the defendant is to insure that the public's interest in having persons accused of crimes brought to trial is not sacrificed in the name of punishing a prosecutor's misconduct. And, of course, where the prosecutor's failure to make discovery has not irreparably prejudiced the defendant, the sanction of dismissal punishes the public, not the prosecutor, and results in a windfall to the defendant. . . . [T]he rule authorizing the imposition of sanctions for discovery violation was "never intended to furnish a defendant with a procedural device to escape justice[.]" '
"Del Gaudio, 445 So.2d at 608 (quoting Richardson, 246 So.2d at 774).

*184 "The order of dismissal in this case contains no finding of prejudice to the defendant nor does our review of the record support such a finding."
899 So.2d at 1182-83.[6] We agree with the rationale of the Florida appellate court. See also Fahie, 419 F.3d at 259 ("[T]o merit the ultimate sanction of dismissal, a discovery violation in the criminal context must meet the two requirements of prejudice and willful misconduct, the same standard applicable to dismissal for a Brady violation.").
Under any analysis, to warrant dismissal of the charges the defendant must show intentional or willful misconduct and prejudice. Even if Moore established intentional and willful misconduct, which we question, the circuit court made no finding that the evidence that was suppressed could not, and has not been, furnished or made available to Moore. The trial court did not consider "the factors relevant to a sanction for prosecutorial misconduct, and in particular, the two prerequisites to dismissal with prejudice." Government of the Virgin Islands v. Fahie, 419 F.3d at 259.
Moreover, it appears from the record that Moore has received the materials that were discussed at the hearing on the motion to dismiss and has full access to the witnesses whose statements were not disclosed to him.[7] Certainly, Moore was prejudiced at his first trial; however, we see no indication that the prejudice suffered by Moore could not be corrected by a new trial. Moore got all the relief to which he was entitled  a new trial. The words of the United States Supreme Court are relevant here:
"Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest. The underlying purpose of permitting retrial is as much furthered by application of the rule to this case as it has been in cases previously decided."
*185 United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).
Our decision should not be meant as condoning the conduct of the prosecutor. Like the circuit court we are concerned at the prosecutor's actions. "We are not unmindful of the court's frustration with the prosecutor's defiance in the face of the court's order." State v. Carpenter, 899 So.2d at 1183. However, any prejudice that was suffered in the first trial may be corrected by a new trial. Accordingly, based on the cases cited above, we hold that the circuit court erred in imposing the extreme sanction of dismissal of the capital-murder indictment returned against Moore.
For the foregoing reasons, the judgment is reversed and the case remanded to the circuit court with instructions that that court set aside its order dismissing the charges and restore Moore's case to its active docket.
REVERSED AND REMANDED.
BASCHAB, SHAW, and WISE, JJ., concur.
COBB, J., concurs specially, with opinion.
COBB, Judge, concurring specially.
The majority has thoroughly discussed the relevant legal principles in this case, and I agree with the determination that double-jeopardy principles do not require that the indictment against Daniel Wade Moore be dismissed. I also agree with the majority that the prejudice Moore suffered as a result of the prosecution's discovery violations can be corrected by granting him a new trial. I am writing specially only to commend the courageous trial judge for his actions in this case.
My review of the record in this case convinces me that the evidence that was withheld by the prosecution went to the very heart of the defense. That prosecutors occasionally fail to disclose exculpatory evidence is not a surprise. The surprise here is that some of the undisclosed evidence had serious exculpatory value, that the defense became aware of some of the evidence only when a witness contacted defense counsel after the trial about a statement she had given to the police before the trial, and that much of the evidence was not disclosed until after the trial and after the prosecutor at trial had denied its very existence. Some of the evidence was so significant that it might easily have caused the jury to have a reasonable doubt regarding Moore's guilt. Because Judge Glenn Thompson, the trial judge, was so deeply disturbed by the extremely untimely disclosure of the valuable evidence and by the prosecutor's apparent disregard of Judge Thompson's open-file discovery order, Judge Thompson attempted to remedy the situation by dismissing the indictment. Clearly, Judge Thompson was attempting to act in accordance with his obligation to ensure that every citizen of Morgan County receives a fair trial and to prevent Moore from having to defend himself a second time, when the first prosecution was clearly unfair.
If these serious discovery violations had come to light during the trial and a defense motion for a mistrial had been granted, the procedural posture of the case would have been entirely different and the dismissal of the indictment would have been proper. Because the discovery violations were not revealed until after the trial and because the evidence and witnesses are available to Moore, however, the law, as it now stands, indicates that the proper remedy is a new trial. Therefore, I must concur to reverse the trial court's order dismissing the indictment.
NOTES
[1] Investigator's Pettey's name is spelled both Pettey and Petty in the record.
[2] We do not have the occasion to reach the question of whether knowledge within the exclusive control of the FBI is imputed to local law-enforcement officials. The duty to disclose is limited to information in the possession of persons who are "sufficiently subject to the prosecutor's control." Commonwealth v. Martin, 427 Mass. 816, 824, 696 N.E.2d 904, 909 (1998).
[3] In fact, the circuit court specifically stated in its order that: "By excluding this evidence, Mr. Valeska greatly enhanced his chances for a conviction." (C.R. 53.)
[4] The circuit court also stated in its order that Moore had a right to a single adjudication of his guilt. However, the United States Supreme Court in Oregon v. Kennedy, stated otherwise:

"The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. United States v. Dinitz, 424 U.S. 600 (1976). As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a `valued right to have his trial completed by a particular tribunal.' Wade v. Hunter, 336 U.S. 684 (1949). The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding. United States v. Jorn, 400 U.S. 470, 483-484 (1971) (plurality opinion); Wade v. Hunter, 336 U.S., at 689. If the law were otherwise, `the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.' Ibid."
456 U.S. at 671-72[, 102 S.Ct. 2083] (emphasis added; footnote omitted).
[5] Rule 16.5 is patterned after Rule 16(d)(2), Fed.R.Crim.P.
[6] Still other jurisdictions have held that the harshest penalty for a prosecutor's Brady violation is a new trial. As the United States Court of Appeals for the Third Circuit noted in Government of the Virgin Islands v. Fahie, 419 F.3d at 254:

"Some Courts of Appeals have remarked or implied that no harsher sanction than a new trial is ever available to remedy a Brady violation. See United States v. Mitchell, 164 F.3d 626 (4th Cir.1998) (unpublished table decision); United States v. Davis, 578 F.2d 277, 280 (10th Cir.1978); United States v. Evans, 888 F.2d 891, 897 n. 5 (D.C.Cir.1989). . . . Notably, in all jurisdictions, dismissal with prejudice is in practice a rare sanction for any constitutional violation."
(Footnote omitted.) See also United States v. Garcia, 780 F.Supp. 166, 176 (S.D.N.Y.1991) ("The remedy for a violation of Brady and 18 U.S.C. § 3500 is a new trial  not the double jeopardy bar."); United States v. Davis, 578 F.2d 277, 280 (10th Cir.1978) ("[T]he most an invocation of Brady could accomplish would be the ordering of a new trial in which the withheld information is fully disclosed.").
[7] Both witnesses testified that they would be ready, willing, and able to testify in any subsequent proceedings in this case.