These companion cases arise out of the trial court's decision to dismiss the indictments against Antonia M. Hall and his wife and codefendant, Carolyn A. Hall, when prosecutors failed to provide the Halls' attorney with a copy of a videotape that had been requested on numerous occasions.
Antonia Hall was indicted for third-degree burglary, a violation of § 13A-7-7, Ala. Code 1975, and first-degree theft, a violation of § 13A-8-3, Ala. Code 1975, for the theft of credit and debit cards, a television set, a laptop computer, and jewelry. Carolyn Hall was indicted for fraudulent use of a credit card, a violation of § 13A-9-14(b), Ala. Code 1975, for using one of *Page 777 
the credit cards that her husband, Antonia, allegedly stole.
The record in both cases indicates the following. At the outset of the investigation in this matter, the Halls' attorney, Russell Duraski, discussed with law-enforcement officials the existence of a videotape that had been recorded at Calhoun Foods, the grocery store where Carolyn Hall was alleged to have used a stolen credit card. Duraski said he asked whether he could watch the videotape with investigators to determine whether the Halls were the people seen on the videotape using certain credit cards. The investigators told him they would "get with the prosecutors" and then let him view the tape with them. (R. 3.)
The Halls' position was that they were not involved in the theft and use of the credit cards, and they are "absolutely adamant" that they were not the people seen in the videotape. (R. 6.)
Duraski was never given the opportunity to view the videotape, and the Halls were arrested. On October 13, 2006, the day the Halls' preliminary hearing was to be held, Duraski had a conversation with a deputy district attorney and law-enforcement officials during which it was agreed that the Halls would waive the preliminary hearing in exchange for production of discovery, including the videotape at issue. Duraski said he was told that he would have the videotape "in a few days." (R. 3.) At that time, a police officer told Duraski he had the videotape.
The videotape was never produced, despite Duraski's repeated requests. Also, Duraski said he had been made aware that there was another videotape recorded at a business in Auburn. That tape also was not produced. The Halls filed a motion to compel discovery. At their arraignment on November 30, 2006, they again requested the videotape and made an oral motion to the trial court to supplement their written motion. On December 3, 2006, the trial court granted their motion to compel and ordered the prosecution to produce all discovery, including the videotape recorded at Calhoun Foods, on or before the close of business on December 8, 2006. (CR.24.)
In mid-January 2007, Duraski said he was told that the Calhoun Foods videotape had been "accidentally destroyed" (R. 4-5) and that it no longer existed. Duraski was provided with a photograph in lieu of the tape, but, he said, he was unable to make out anything about the person in the photograph.
The trial court asked for an explanation from the State as to why it either had not provided the Calhoun Foods videotape to Duraski or why it continued to promise him the tape if it had been destroyed. In ruling that the indictments against the Halls were being dismissed, the trial court said, "We went for months and months saying we're going to get you a tape when there wasn't one to get." (R. 11.)
The court continued its explanation for the dismissal of the indictments, saying:
 "[T]hat is bad conduct on the part of the State, and we cannot just continue to make false representations like that. I mean, that is inappropriate. And Mr. Duraski's whole case, as I understand it from him, was whether or not these folks could be identified on the tape. In other words, if they were on the tape and you can identify them, then, fine, that speaks for itself. But even if you couldn't identify them, that didn't mean the case was going away. That just would tell Mr. Duraski, hey, I've got something good to argue at trial; you can't tell that's my folks. But the tape was very instrumental in his defense."
(R. 12.)
The trial court then reiterated that it was dismissing the indictments because *Page 778 
the State's conduct was improper, saying, "[Y]ou cannot continue for months and make representations that are not true. I mean, that is totally improper." (R. 13.)
The State appeals from the dismissal of the indictments against both Antonia Hall and Carolyn Hall.
At the outset, we note that "`[t]he rules of criminal discovery are not "mere etiquette," nor is compliance a matter of discretion.'" State v. Moore, 969 So.2d 169, 176
(Ala.Crim.App. 2006), quoting State v. Scott,943 S.W.2d 730, 735 (Mo.Ct.App. 1997). Rule 16, Ala. R.Crim. P., which provides for discovery in criminal cases, authorizes a trial court to impose sanctions against a party that fails to comply with a discovery order. Rule 16.5 states:
 "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such other order as the court deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."
It appears from the wording of Rule 16.5, Ala. R.Crim. P., that a circuit court, based upon its supervisory powers over proceedings before it, has the authority to dismiss an indictment because of the government's wrongful conduct.State v. Moore, 969 So.2d 169, 182 (Ala.Crim.App. 2006). In addition, Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215(1963), requires the government to disclose exculpatory evidence or risk sanctions.
There are limitations upon the circuit court's ability to dismiss an indictment on the grounds of the prosecution's wrongful conduct, however. To establish a Brady
violation, for example, three elements must be proven: 1) the prosecution's suppression of evidence; 2) the favorable character of the suppressed evidence for the defense; and 3) the materiality of the suppressed evidence. Brady,373 U.S. at 87, 83 S.Ct. 1194.
In Moore, this Court discussed at length the limitations upon the trial court's ability to dismiss an indictment based upon improper conduct of the prosecution.
 "In Government of the Virgin Islands v. Fahie, 419 F.3d 249 (3d Cir. 2005), the federal district court reversed a lower court's dismissal of the charges against Fahie based on a Brady
violation. The court stated: `Our research discloses no case where a federal appellate court upheld dismissal with prejudice as a remedy for a Brady violation.' 419 F.3d at 254 n. 6. The court then discussed the various federal circuits and their individual responses to prosecutorial misconduct that necessitates a retrial. The court stated:
 "`Given the "societal interest in prosecuting criminal defendants to conclusion," it is especially important in the criminal context that a court applying sanctions for violation of Rule 16 carefully assess whether dismissal with prejudice is necessary to exact compliance with discovery obligations. [United States v.] Coleman, 862 F.2d 455 [(3d Cir. 1988)]. In particular, as discussed above, a court must look to both the need to undo prejudice resulting from a violation and the appropriate deterrent value of the sanction in each case. *Page 779 
 "`Other courts have considered the question of when a court may dismiss an indictment under its supervisory powers. The Ninth Circuit has held that "[d]ismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice." United States v. Kearns, 5 F.3d 1251, 1253 (9th Cir. 1993). It has suggested that prosecutorial conduct might satisfy those requirements even where it would fail to justify dismissal under Brady directly. See [United States v.] Ross, 372 F.3d [1097] at 1110 [(9th Cir. 2004)]; United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991). The Seventh Circuit has adopted a more restrictive approach, holding that a sanction under supervisory powers is only appropriate where the conviction could not have been obtained but for the failure to disclose exculpatory evidence. See United States v. Johnson, 26 F.3d 669, 683
(7th Cir. 1994). At least two other circuits instruct courts to balance a number of factors in their choice of a sanction, including "the reasons for the Government's delay in affording the required discovery, the extent, of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess." United States v. Euceda-Hernandez, 768 F.2d 1307, 1312 (11th Cir. 1985); see also United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988). While we appreciate the importance of all these factors, we believe that, to merit the ultimate sanction of dismissal, a discovery violation in the criminal context must meet the two requirements of prejudice and willful misconduct, the same standard applicable to dismissal for a Brady violation. Accordingly, we do not expect that trial courts will dismiss cases under their supervisory powers that they could not dismiss under Brady itself.
 ". . . .
"419 F.3d at 258.
"In United States v. Euceda-Hernandez, 768 F.2d 1307
(11th Cir. 1985), the court stated:
 "`In exercising its discretion, the district court must weigh several factors, and, if it decides a sanction is in order, should fashion "the least severe sanction that will accomplish the desired result — prompt and full compliance with the court's discovery orders." United States v. Sarcinelli, 667 F.2d 5, 7 (5th Cir. Unit B 1982). See also [United States v.] Burkhalter, 735 F.2d [1327] at 1329 [(11th Cir. 1984)]; United States v. Gee, 695 F.2d 1165, 1169 (9th Cir. 1983) (citing Sarcinelli, supra). Among the factors the court must weigh are the reasons for the Government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess. Burkhalter, 735 F.2d at 1329; United States v. Hartley, 678 F.2d 961, 977 (11th Cir. 1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 and 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); Sarcinelli, 667 F.2d at 6-7.
 "`. . . .
 "`The presence of a clear violation of a discovery order does not excuse a trial judge from weighing the factors cited above and imposing the least severe, but effective, sanction. The *Page 780 
purpose of requiring the Government to disclose evidence is to promote "the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea; by minimizing the undesirable effect of surprise at trial; and by otherwise contributing to an accurate determination of the issue of guilt or innocence." Fed.R.Crim.P. 16 advisory committee note.'
"768 F.2d at 1312 (footnote omitted).
"Our neighboring State of Florida in State v.Carpenter, 899 So.2d 1176 (Fla.Dist.Ct.App. 2005), cautioned against dismissing the charges as a sanction for aBrady violation and aptly stated:
 "`Dismissal of an information is, however, an extreme sanction that should be used with caution, and only when a lesser sanction would not achieve the desired result. State v. Thomas, 622 So.2d 174, 175
(Fla. 5th DCA 1993). See also [State v.] Del Gaudio, 445 So.2d [605] at 608
[(Fla.Dist.Ct.App. 1993)] ("Dismissal of an information or indictment is `an action of such magnitude that resort to such a sanction should only be had when no viable alternative exists'") (quoting State v. Lowe, 398 So.2d 962, 963 (Fla. 4th DCA 1981)). Before a court can dismiss an information for a prosecutor's violation of a discovery rule or order, the trial court must find that the prosecutor's violation resulted in prejudice to the defendant. Thomas, 622 So.2d at 175; Richardson v. State, 246 So.2d 771 (Fla. 1971).
 "`"The obvious rationale for limiting the sanction of dismissal of criminal charges to only those cases where no other sanction can remedy the prejudice to the defendant is to insure that the public's interest in having persons accused of crimes brought to trial is not sacrificed in the name of punishing a prosecutor's misconduct. And, of course, where the prosecutor's failure to make discovery has not irreparably prejudiced the defendant, the sanction of dismissal punishes the public, not the prosecutor, and results in a windfall to the defendant. . . . [T]he rule authorizing the imposition of sanctions for discovery violation was `never intended to furnish a defendant with a procedural device to escape justice[.]'"
 "`Del Gaudio, 445 So.2d at 608 (quoting Richardson, 246 So.2d at 774).
 "`. . . .'
 "899 So.2d at 1182-83. We agree with the rationale of the Florida appellate court. See also Fahie, 419 F.3d at 259 (`[T]o merit the ultimate sanction of dismissal, a discovery violation in the criminal context must meet the two requirements of prejudice and willful misconduct, the same standard applicable to dismissal for a Brady violation.')."
Moore, 969 So.2d at 182-84.
The United States Supreme Court has explained the need for balancing the defendant's right to a fair trial with society's interest in punishing wrongdoers as follows:
 "Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting *Page 781 
against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest. The underlying purpose of permitting retrial is as much furthered by application of the rule to this case as it has been in cases previously decided."
United States v. Tateo, 377 U.S. 463, 466,84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).
In this case, the Halls were no doubt prejudiced by the destruction of the videotape that law-enforcement officials contend contains footage of Carolyn Hall making a purchase with a stolen credit card. Indeed, as the trial court pointed out, the Halls' defense has consistently been that Carolyn Hall was not the woman seen in the video. If, as the Halls assert, the videotape revealed that the woman who used the stolen credit card was not Carolyn Hall, or was inconclusive, such evidence may have been a strong refutation of the government's cases. Indeed, if someone other than Carolyn Hall was using the credit card, such evidence may cast doubt upon whether Antonia Hall was the person who stole the card, as the government alleges. However, it is difficult, if not impossible, for the Halls to refute the government's claims as to what was on the videotape if the videotape no longer exists.
Less clear is whether the government's conduct in this case was willful. Evidence suggests that the videotape was inadvertently erased while it was still in the possession of the grocery store where the stolen credit card was used. However, other evidence tends to show that representations were made to the Halls' attorney that law-enforcement officials were already in possession of the videotape and that a copy of the tape would be provided to them at any time. Based upon those representations, the Halls agreed to waive their preliminary hearings in exchange for a copy of the videotape. It is difficult to understand how law-enforcement officials could make such representations if they were not actually in possession of the tape, or to understand why law enforcement officials did not endeavor to have a copy of the tape made from the store's original video as soon as the existence of the tape was made known, to them. If law-enforcement officials did attempt to make a copy of the tape at the outset of their investigation but were unable to do so because the tape had already been erased, then they would have had to have known that a copy could not be provided to the defendants, and their representations to the contrary were baseless. Nonetheless, the Halls were told on numerous occasions, including at hearings before the trial court, that a copy of the videotape would be made available to them.
The fact that it was law-enforcement officials and not the prosecutors themselves who allowed such misrepresentations to go forward is irrelevant. "The knowledge of government agents working on the case, including a deputy sheriff, as to the existence of exculpatory evidence will be imputed to the prosecutor. Sexton v. State, 529 So.2d 1041, 1045
(Ala.Crim.App. 1988)." Savage v. State, 600 So.2d 405,407 (Ala.Crim.App. 1992); see also, Moore,969 So.2d at 176.
Regardless of whether the government's conduct was intentional or inadvertent, the fact remains that the Halls have been deprived of viewing a key piece of evidence that the State apparently intends to rely upon in its case against them. The trial court's attempt to rectify the prejudice against the Halls was not misplaced. However, lesser sanctions than the dismissal of the Halls' indictments were available *Page 782 
to the trial court for the government's failure to produce the videotape as promised.
In the cases cited above, the means by which the balancing of interests between the rights of a defendant to exculpatory evidence and the right of society to pursue justice although the government's conduct had deprived a defendant of his right to such evidence was resolved was by allowing the defendant to have a new trial in which he had the ability to make use of the exculpatory evidence.
This case differs from the cases discussed above, however, in that the Halls were aware of the existence of allegedly exculpatory evidence before their initial trials. Thus, the Halls have the opportunity to make use of the government's destruction of possibly exculpatory evidence — whether such destruction was intentional or inadvertent — during their original trials. They can question law-enforcement officials about how and when the officials became aware of the destruction of the videotape, the fact that the Halls were never allowed to view the videotape despite repeated requests — some of which were made even before they were arrested, and can then allow the jury to draw its own inferences regarding the videotape's destruction. Such a solution provides a better balance between the competing interests of the defendants and society than the trial court's extreme decision to dismiss the indictments outright — a decision that summarily forecloses society's right to seek justice.
As was the case in Moore, our decision in the instant case should not be seen as condoning the conduct of the government in entering into an agreement with the Halls based upon the production of the videotape and, further, in leading the Halls to believe that law-enforcement officials had possession of the videotape and that a copy of the tape was forthcoming when in fact the videotape had been destroyed. Like the trial court, we believe the government's actions are cause for concern. However, rather than dismissing the indictments against the Halls, the trial court can ensure that any prejudice that the Halls have suffered as a result of the videotape's destruction may be brought to light during their trials.
Accordingly, based on the cases cited above, we hold that the circuit court erred in imposing the extreme sanction of dismissing the indictments against the Halls. Thus, the order of the circuit court dismissing the indictments is reversed and these causes are remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN and WISE, JJ, concur. BASCHAB, P.J., concurs in the result. SHAW, J., dissents.